IN THE COURT OF APPEALS OF TENNESSEE
AT MEMPHIS
January 22, 2008 Session

**JOHN DOE**

**v.**

**CATHOLIC BISHOP FOR THE DIOCESE OF MEMPHIS**

**Appeal from the Circuit Court for Shelby County**
**No. CT-004850-06     Robert L. Childers, Judge**

**No. W2007-01575-COA-R9-CV - Filed September 16, 2008**

This appeal involves the denial of a motion to dismiss based on the statute of limitations. The plaintiff, a thirty-seven year old man, filed a lawsuit against the defendant Catholic diocese. His complaint alleged that, as an adolescent, he was sexually abused by a Catholic priest employed by the defendant diocese. The lawsuit alleged that the diocese was negligent in hiring, retaining, and supervising the priest, and that the diocese breached its fiduciary duty to the plaintiff by failing to disclose to him its knowledge that the priest had abused other young boys. The diocese filed a motion to dismiss, arguing that the lawsuit was barred by the statute of limitations. In response, the plaintiff argued that the statute of limitations was tolled under the discovery rule, the doctrine of fraudulent concealment, and the doctrine of equitable estoppel. The trial court denied the motion to dismiss. The diocese was granted permission for this interlocutory appeal. On appeal, we reverse, finding that the plaintiff's complaint is time-barred, and cannot be saved by the discovery rule, the doctrine of fraudulent concealment, or the doctrine of equitable estoppel.

**Tenn. R. App. P. 9 Interlocutory Appeal by Permission;**
**Judgment of the Circuit Court Reversed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., joined; W. FRANK CRAWFORD, J., did not participate.

John H. Dotson, Michael Casey Shannon, and J. Martin Regan, Memphis, Tennessee for the appellant Catholic Bishop for the Diocese of Memphis

Gary K. Smith, Karen M. Campbell, Memphis, Tennessee, and Adam D. Horowitz, Miami, Florida, for the appellee John Doe

# OPINION

## FACTS AND PROCEEDINGS BELOW

This case is another in the onslaught of lawsuits nationwide against the Catholic Church arising out of alleged sexual abuse of a minor by a member of the clergy.[1] The facts alleged in the complaint are disturbingly similar to the facts alleged in many of these lawsuits. For purposes of this appeal, we accept them as true.

Plaintiff/Appellee John Doe ("Doe") was born in February 1969, and was raised in the Roman Catholic faith. Father Daniel DuPree ("Father DuPree") was a Catholic priest; during the 1980's, Father DuPree served Catholic parishes in the Memphis, Tennessee area. These parishes were overseen by the Defendant/Appellant Catholic Bishop for the Diocese of Memphis ("Diocese"), a religious organization associated with the Roman Catholic Church.

Doe met Father DuPree in 1983, when Doe was approximately 14 years old. At the time, Father DuPree was a young new priest, and Doe was a congregant of the Church of the Resurrection in Memphis. Father DuPree promised to revive Doe's youth group at the Church, and regularly invited Doe to have lunch with him and the other priests at the Church rectory. In doing so, Father DuPree became close friends with Doe. He also became a friend of Doe's family, and on occasion was invited to their home for dinner and to preside over family events. Doe's parents were pleased that Father DuPree took an interest in their son because they hoped that Doe would one day enter the priesthood.

In December 1985, Doe's family permitted Doe to accompany Father DuPree on a trip to Texas to visit Father DuPree's family. Father DuPree's sexual abuse of Doe began on this trip to Texas. The first instance occurred in a hotel room that Doe and Father DuPree shared on the way to Texas. It continued during the stay at the home of Father DuPree's parents, where Doe and Father DuPree shared a bed.

Not long after that, Father DuPree began working as a chaplain and guidance counselor at Christian Brothers High School in Memphis. Doe was a student at the school. Father DuPree's sexual abuse of Doe continued through their contacts at school and church. During this time, Father Dupree remained in the employ of the Diocese. Doe turned eighteen years old in February 1987.

On September 14, 2006, Doe filed a lawsuit against the Diocese in the Circuit Court for Shelby County, Tennessee. At the time the lawsuit was filed, Doe was thirty-seven years old.

---

[1] A study authorized by the United States Conference of Catholic Bishops found that, between 1950 and 2002, 4,392 Catholic priests were accused of sexual abuse of over 10,000 minors. Less than 13% of the allegations were made in the year that the abuse allegedly began, and over 25% of the allegations were made more than 30 years after the alleged abuse. *See generally* THE JOHN JAY COLLEGE RESEARCH TEAM, THE NATURE AND SCOPE OF THE PROBLEM OF SEXUAL ABUSE OF MINORS BY CATHOLIC PRIESTS AND DEACONS IN THE UNITED STATES (2004), *available at* www.uscch.org/inrb/johnjaystudy1, *cited in* Michael J. Sartor, Note, *Respondeat Superior, Intentional Torts, and Clergy Sexual Misconduct: The Implications of Fearing v. Bucher*, 62 WASH. & LEE L. REV. 687, 688 n.1 (2005).

The complaint alleges that Doe looked to the Diocese and its representatives for counseling, guidance, and spiritual growth, putting the Diocese in a position of trust and creating a fiduciary relationship between the Diocese and Doe. In addition, the complaint alleges that, prior to Doe's abuse, the Diocese knew or should have known that Father DuPree was a pedophile and a sexual predator. As a fiduciary, Doe asserts, the Diocese had a duty to disclose to Doe its knowledge that Father DuPree posed a danger to children and to protect Doe from Father DuPree's sexual abuse. Instead, the Diocese intentionally and fraudulently concealed its knowledge of Father DuPree's propensities and its own negligent supervision of him.

The basis of Doe's claim for relief against the Diocese is negligence; he asserts that the Diocese owed him a duty of reasonable care in the hiring, retention, and supervision of Father DuPree. Doe avers in his complaint that, "[d]espite the exercise of reasonable diligence, [Doe] only recently learned of the [Diocese's] negligent conduct."[2] Doe also asserts that, as a result of the sexual abuse he endured at the hands of Father DuPree, he experienced severe psychological injuries, including loss of faith, mood swings, intimacy problems, emotional disconnection, anxiety, rage, and loss of enjoyment of life. He alleges that the Diocese's actions were a direct and proximate cause of his injuries. For these injuries, Doe seeks damages in excess of $10,000,000.

The Diocese responded to Doe's complaint by filing a motion to dismiss pursuant to Rule 12.02(6) of the Tennessee Rules of Civil Procedure. The Diocese asserts that Doe's complaint is barred by the one-year statute of limitations, set forth in Tennessee Code Annotated § 28-3-104,[3] and that, accordingly, Doe fails to state a claim for which relief can be granted.

In its motion to dismiss, the Diocese acknowledges that, because the alleged abuse began while Doe was a minor, the statute of limitations was tolled under Tennessee Code Annotated § 28-1-106[4] until Doe turned eighteen in February 1987. At that point, the Diocese asserts, the statute of limitations began to run. Because the applicable limitations period is one year, any action filed after

---

[2]Doe's complaint does not specify the date on which he allegedly "learned" of the Diocese's negligence or the event that resulted in his discovery.

[3]Section 28-3-104 provides, in pertinent part:

(a) The following actions shall be commenced within one (1) year after the cause of action accrued:
> (1) Actions for libel, *for injuries to the person*, false imprisonment, malicious prosecution, breach of marriage promise . . . .

T.C.A. § 28-3-104 (2000) (emphasis added).

[4]Section 28-1-106 provides:

If the person entitled to commence an action is, at the time the cause of action accrued, either under the age of eighteen (18) years, or of unsound mind, such person . . . may commence the action, after removal of such disability within the time of limitation for the particular cause of action, unless it exceeds three (3) years, and in that case within three (3) years from the removal of such disability.

T.C.A. 28-1-106 (2000).

February 1988 would be time-barred. As Doe did not file his complaint until 2006, the Diocese argues, it should be dismissed as untimely.

In response to the Diocese's motion to dismiss, Doe argued that the Diocese was in a fiduciary relationship with him and that, as such, its silence about Father DuPree's pedopholic propensities and actions constituted fraudulent concealment, which would toll the statute of limitations. Doe also maintained that the Diocese was equitably estopped from relying on the statute of limitations because it had remained silent when it knew or should have known about Father DuPree's conduct. Finally, Doe asserted that the discovery rule applied to prevent his complaint from being time-barred because he neither knew nor had reason to know that the Diocese had been negligent in hiring and supervising Father DuPree. Doe maintained that his knowledge of Father DuPree's sexual abuse of him was not tantamount to knowledge that the Diocese had acted negligently.

In reply to Doe's argument, the Diocese contended that, under all of the theories relied on by Doe, the statute of limitations is only tolled until a plaintiff learns or, through the exercise of reasonable diligence, should have learned about his right of action. The Diocese noted that, at the time Doe reached majority, Doe knew he had been abused, knew that Father DuPree was employed by the Diocese, and knew that he (Doe) relied on the Diocese for guidance, counseling and spiritual growth. Accordingly, the Diocese argued, Doe could not rely on the discovery rule, fraudulent concealment, or equitable estoppel to toll the statute of limitations.

On April 4, 2007, the trial court issued an order denying the Diocese's motion to dismiss. The trial court did not set forth its reasoning in the order.

The Diocese then filed a motion under Rule 9 of the Tennessee Rules of Appellate Procedure, seeking permission for interlocutory appeal of the trial court's order. This motion was not opposed, and permission to appeal was granted by both the trial court and the appellate court.

## ANALYSIS

The conduct alleged in Doe's complaint constitutes an "invidious breach" of the relationship of a parishioner with his priest and his church, which "warrants the severest possible condemnation by all right thinking persons of compassion." ***Doe v. Coffee County Bd. of Educ.***, 852 S.W.2d 899, 903 (Tenn. Ct. App. 1993). We are obligated, however, to examine dispassionately the timeliness of Doe's claims, respecting the important function of statutes of limitation in ensuring the prompt prosecution of claims and fairness to all parties.

### Issues on Appeal

On appeal, the Diocese argues that the trial court erred in denying its motion to dismiss. It argues that none of the theories relied on by Doe, namely, the discovery doctrine, fraudulent concealment, and equitable estoppel, apply to toll the statute of limitations.

## Standard of Review

A motion to dismiss for failure to state a claim for which relief can be granted "tests only the legal sufficiency of the complaint. . . ." **Stein v. Davidson Hotel Co.**, 945 S.W.2d 714, 716 (Tenn. 1997). Our review of an appeal from a dismissal for failure to state a claim is "limited to the allegations in the complaint . . . ." **Randolph v. Dominion Bank of Middle Tenn.**, 826 S.W.2d 477, 478 (Tenn. Ct. App. 1991). Therefore, "we must construe the complaint liberally in favor of the plaintiff, taking all of the allegations of fact therein as true." **Id.** (citation omitted). Whether the trial court erred in its ruling on a motion to dismiss is a question of law. **Farris v. Todd**, No. E1999-01574-COA-R3-CV, 2000 WL 528408, at *2 (Tenn. Ct. App. May 3, 2000). We review the trial court's conclusions of law *de novo* with no presumption of correctness. **Stein**, 945 S.W.2d at 716 (citations omitted).

## Undisputed Facts

At the outset of our analysis, it is important to note several points. First, Doe's lawsuit includes no claims against Father DuPree; the only claims asserted are against the Diocese. Second, Doe asserts no claim of "vicarious liability" against the Diocese, under which an employer may be held liable for injuries to a third party caused by an employee's wrongful acts, so long as the employee's acts are within the scope of his employment. **White v. Revco Disc. Drug Centers, Inc.**, 33 S.W.3d 713, 724 (Tenn. 2000). Rather, Doe asserts that the Diocese has direct liability for the negligent hiring, supervision, and retention of Father DuPree.

Tennessee courts recognize the negligence of an employer in the selection and retention of employees and independent contractors. **See, e.g., Marshalls of Nashville, Tenn., Inc. v. Harding Mall Associates, Ltd.**, 799 S.W.2d 239, 243 (Tenn. Ct. App. 1990); **Phipps v. Walker**, No. 03A01-9508-CV-00294, 1996 WL 155258, at *2 (Tenn. Ct. App. Apr. 4, 1996). A plaintiff in Tennessee may recover for negligent hiring, supervision or retention of an employee if he establishes, in addition to the elements of a negligence claim, that the employer had knowledge of the employee's unfitness for the job. **See Phipps**, 1996 WL 155258, at *3. At this point in the litigation, we assume *arguendo* that a claim for negligent hiring, supervision, and retention may be asserted in the context of a diocese-priest relationship.[5]

It is undisputed that, at the time he reached majority, Doe knew that he had been sexually abused by Father DuPree,[6] that he had a right of action against Father DuPree, and that Father

---

[5]The Diocese has not argued on appeal that negligent hiring, retention, and supervision cannot be asserted against it. **See Rita M. v. Roman Catholic Archbishop of L.A.**, 232 Cal. Rptr. 685 (Ct. App. 1986) (holding that diocese and priest have an employer-employee relationship); **but see Brillhart v. Scheier**, 758 P.2d 219, 224 (Kan. 1988) (holding that priest was independent contractor, not employee, and that vicarious liability was not applicable).

[6]In some cases involving similar allegations of sexual abuse, the plaintiff has alleged that his memories of the abuse were repressed until well into adulthood. **See, e.g., H.R.B. v. J.L.G.**, 913 S.W.3d 92 (Mo. Ct. App. 1995). Doe makes no such allegation in this case.

DuPree was employed by the Diocese.[7] It is undisputed that the applicable statute of limitations is one year, under Tennessee Code Annotated § 28-3-104, and that Doe's cause of action accrued when he reached majority in 1987, unless the statute of limitations was tolled under one of the theories asserted by Doe. With these facts in mind, we review the trial court's denial of the Diocese's motion to dismiss.

**Tolling Theories**

Doe asserts three theories for tolling the statute of limitations: the discovery rule, fraudulent concealment, and equitable estoppel. These theories are distinct but similar. We will discuss each separately. As will be seen, however, the essential inquiry under each theory boils down to this: through the exercise of reasonable diligence, at the time Doe reached majority, would he have learned that the Diocese had knowledge of prior incidents of child sexual abuse committed by Father DuPree?

**1.** *Discovery Rule*

The discovery rule was first applied by the Tennessee Supreme Court in ***Teeters v. Currey***, 518 S.W.2d 512 (Tenn. 1974). In ***Teeters***, a medical malpractice action, the Court stated, "We find it difficult to embrace a rule of law . . . requiring that [a plaintiff] sue to vindicate a non-existent wrong, at a time when injury was unknown and unknowable." ***Teeters***, 518 S.W.2d at 515. The Court has applied the discovery rule to tort actions governed by the one-year statute of limitations, stating:

> Under the "discovery rule" applicable in tort actions, including but not restricted to products liability actions predicated on negligence, strict liability or misrepresentation, the cause of action accrues and the statute of limitations begins to run when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, it should have been discovered.

***Potts v. Celotex Corp.***, 796 S.W.2d 678, 680 (Tenn. 1990) (citing ***McCroskey v. Bryant Air Conditioning Co.***, 524 S.W.2d 487, 491 (Tenn. 1975); ***Teeters***, 518 S.W.2d at 512). It is important to note that "[t]he discovery rule applies only in cases where the plaintiff does not discover *and reasonably could not be expected to discover* that he had a right of action." ***Id.*** (emphasis added). If the plaintiff has information that would place a reasonable person on inquiry notice that he may have a cause of action, the statute of limitations will not be tolled. ***Levine v. March***, No. M2006-00297-COA-R3-CV, 2007 WL 4181554, at *4 (Tenn. Ct. App. Nov. 27, 2007) (citing ***Potts***, 796 S.W.2d at 680-81).

---

[7]On appeal, Doe notes that he does not specifically allege in his complaint that he knew that Father DuPree was under the Diocese's supervision. He does not dispute, however, that specific knowledge of the identity of Father DuPree's employer would have been easily obtained.

On occasion, an injury is discovered but its source remains hidden; in those circumstances, courts have tolled the statute of limitations until the plaintiff discovers the identity of the tortfeasor or the source of the injury. *See, e.g., Foster v. Harris*, 633 S.W.2d 304, 305 (Tenn. 1982); *Hathaway v. Middle Tenn. Anesthesiology, P.C.*, 724 S.W.2d 355, 359 (Tenn. Ct. App. 1986). In *Foster*, the plaintiff unknowingly became infected with serum hepatitis during a dental procedure in October, 1975. *Foster*, 633 S.W.2d at 304. He discovered his illness in January 1976, but did not discover the source of the illness until July 1976, when the defendant dentist informed the plaintiff that he, the dentist, had serum hepatitis. *Id.* The plaintiff filed a lawsuit against the dentist in February 1977. *Id.* The trial court granted summary judgment in favor of the defendant dentist because the plaintiff discovered his injury in October 1975, but did not file his lawsuit until more than one year later. *Id.* On appeal, the Supreme Court reversed the trial court's grant of summary judgment. It noted that no cause of action in tort could exist "until a judicial remedy is available to the plaintiff." *Id.* at 305 (citing *McCroskey v. Bryant Air Conditioning Co.*, 542 S.W.2d 487, 489-90 (Tenn. 1975)). It then stated, "It is axiomatic that no judicial remedy was available to this plaintiff until he discovered, or reasonably should have discovered, (1) the occasion, the manner and means by which a breach of duty occurred that produced his injury; and (2) the identity of the defendant who breached the duty." *Id.* Thus, the Court held that the plaintiff's lawsuit was timely filed because he could not have discovered the identity of the tortfeasor until the dentist's admission. *Id.*

Doe argues that the Diocese's knowledge that other victims had previously made allegations of sexual abuse against Father DuPree is a fact that is essential to his claim of negligent retention or supervision. Thus, he contends, the critical inquiry, in determining when Doe's claim against the Diocese accrued, is when Doe had reason to know of these prior allegations, not when Doe discovered that he was sexually abused by Father DuPree. Doe's complaint alleges that he had no means of discovering that the Diocese was aware of previous allegations against Father DuPree, despite Doe's exercise of reasonable diligence. Because the Diocese concealed this essential fact, at the time Doe reached majority, Doe had no basis for alleging that the Diocese was negligent and no grounds to sue the Diocese.

In response, the Diocese insists that the facts known to Doe at the time he reached majority were sufficient to put him on "inquiry notice." The Diocese maintains that Doe knew that he had suffered injuries due to Father DuPree's wrongful acts, that Father DuPree was employed by the Diocese, and that Doe could have discovered at that time that the Diocese had knowledge of prior allegations of sexual abuse of other minor victims by Father DuPree. Thus, under the discovery rule, we must determine whether, at the time he reached majority, Doe had "inquiry notice" of the fact that the Diocese had knowledge of Father DuPree's prior child sexual abuse.

## 2. Fraudulent Concealment

"A close cousin of the discovery rule is the 'well accepted principle . . . of fraudulent concealment.'" *Mark K. v. Roman Catholic Archbishop of L. A.*, 79 Cal. Rptr. 2d 73, 78 (Cal. Ct. App. 1998) (quoting *Bernson v. Brown*, 873 P.2d 613 (Cal. 1994)).

The Tennessee Supreme Court has set forth the elements of fraudulent concealment:

> To establish fraudulent concealment, a plaintiff must prove (1) that the defendant took affirmative action to conceal the cause of action or remained silent and failed to disclose material facts despite a duty to do so and, (2) the plaintiff could not have discovered the cause of action despite exercising reasonable care and diligence.
>
> ***
>
> The third essential element of fraudulent concealment is knowledge on the part of the defendant of facts giving rise to the cause of action. In other words, the defendant must be aware of the wrong.
>
> ***
>
> The fourth and final essential element of fraudulent concealment is a concealment of material information from the plaintiff.

*Shadrick v. Coker*, 963 S.W.2d 726, 735 (Tenn. 1998) (citations omitted). If a fiduciary relationship exists between the plaintiff and defendant, the party asserting fraudulent concealment need not show affirmative concealment of the cause of action, because " 'failure to speak where there is a duty to speak is the equivalent of some positive act or artifice planned to prevent inquiry or escape investigation.' " *Id.* (quoting *Hall v. De Saussure*, 297 S.W.2d 81, 85 (Tenn. Ct. App. 1956)).

In this case, Doe asserts in his complaint that, at the time he was being victimized, the Diocese had knowledge of other complaints of sexual abuse against Father DuPree. For purposes of the Diocese's motion to dismiss, we assume the truth of this allegation. Such information would be material to Doe's claim that the Diocese negligently hired, supervised, or retained Father DuPree. Doe asserts a fiduciary or special relationship between the Church and its parishioner, such as Doe, that created an affirmative duty on the part of the Diocese to inform Doe of Father DuPree's pedophilic tendencies. The Diocese's failure to speak in the face of such a duty is the wrongful act of which it is accused, and also the equivalent of an affirmative act of fraudulent concealment.[8] For purposes of the motion to dismiss, the Diocese does not appear to dispute the existence of such a fiduciary relationship.[9] Thus, for purposes of this appeal, we assume *arguendo* that the Diocese

---

[8] As stated in *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409 (2d Cir. 1999):

> The issues on this appeal are complicated by the fact that the plaintiff's claim of the Diocese's breach of fiduciary duty has a double role: first, in determining whether the statute of limitations was tolled by the Diocese's alleged fraudulent concealment from Martinelli of his claim against the Diocese, and second, as a substantive basis on which Martinelli claims the diocese is liable to him for the injury of which he complains.

*Martinelli*, 196 F.3d at 416 n.2.

[9] The parties have cited no Tennessee cases on whether the clergy-parishioner relationship is a fiduciary relationship, and we have found none. Some courts have recognized a cause of action for breach of fiduciary duty against a religious institution. *See, e.g., Doe v. Evans*, 814 So. 2d 370, 376 (Fla. 2002). Others have declined to do so,

knew of Father DuPree's propensities before Father DuPree began abusing Doe, had a duty to disclose such to Doe, and failed to do so.

Under the doctrine of fraudulent concealment, the question remains whether Doe, in the exercise of reasonable care and diligence, could have discovered his cause of action against the Diocese; that is, whether Doe could have discovered that, at the time of Doe's abuse, the Diocese had prior knowledge of Father DuPree's proclivities. *See Shadrick*, 963 S.W.2d at 735.

### 3. *Equitable Estoppel*

In Tennessee, a party, by its conduct, may be equitably estopped from relying on the statute of limitations. *Fairway Vill. Condo. Ass'n, Inc. v. Conn. Mut. Life Ins. Co.*, 934 S.W.2d 342, 346 (Tenn. Ct. App. 1996) (citation omitted). "Equitable estoppel and fraudulent concealment 'represent distinct (although kindred) defenses to limitations claims.' " *Doe v. Linam*, 225 F. Supp. 2d 731, 736 (S.D. Tex. 2002) (quoting *Neely v. Bankers Trust Co. of Tex.*, 757 F.2d 621, 632 (5th Cir. 1985)).

The doctrine of equitable estoppel "is premised on the defendant's wrongdoing," and, accordingly, can be invoked to toll the statute of limitations for the period during which the defendant misled the plaintiff. *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d 141, 146 (Tenn. 2001); *cf. Fairway Vill.*, 934 S.W.2d at 346 (explaining that equitable estoppel is less a tolling mechanism and more a doctrine used to prevent a party from relying on a statute of limitations defense).

In order to establish equitable estoppel in Tennessee, the party asserting estoppel must prove that the party to be estopped (1) engaged in a false representation or concealment of material facts, (2) with knowledge, actual or constructive, of the real facts, and (3) with the intent or at least the expectation that its representation or concealment would be acted on by the other party. The party asserting estoppel must also prove that he (1) relied on the false representation or concealment, (2) changed his position to his prejudice, and (3) lacked knowledge and the means of acquiring knowledge of the truth as to the facts in question. *Consumer Credit Union v. Hite*, 801 S.W.2d 822, 825 (Tenn. Ct. App. 1990) (quoting *Callahan v. Town of Middleton*, 292 S.W.2d 501 (Tenn. T. App. 1954)). Also, under appropriate circumstances, equitable estoppel may be based on a party's "silence or negative omission to do anything." *Evans v. Belmont Land Co.*, 231 S.W. 670, 673 (Tenn. 1893); *but see* DOBBS ON REMEDIES § 2.3 ("mere silence or nondisclosure is not enough to trigger estoppel . . . .").

For purposes of this appeal, we assume that the Diocese had knowledge of instances of child sexual abuse by Father DuPree prior to his abuse of Doe, and that the Diocese failed to share this information with Doe. Doe relied on the resulting perception that Father DuPree was safe, acted by continuing to come in contact with Father DuPree, and as a consequence endured sexual molestation by him. We must determine, however, whether Doe had "the means of knowledge of the truth as to

---

[9](...continued)
citing constitutional concerns. *See, e.g., Schmidt v. Bishop*, 779 F. Supp. 321, 328 (S.D.N.Y. 1991).

the facts in question" when he reached majority in 1987. ***Consumer Credit Union***, 801 S.W.2d at 825.

**Inquiry Notice**

Under all three tolling theories, then, we must focus on whether Doe had "inquiry notice" of the alleged fact that, prior to Father DuPree's molestation of Doe, the Diocese had knowledge of instances of sexual abuse of other children.[10] Stated differently, had Doe exercised reasonable diligence at the time he reached majority, would he have learned that the Diocese had knowledge of Father DuPree's prior sexual abuse, and that it chose not to disclose this information to protect Doe?

The parties have not identified a Tennessee case with a similar set of facts, and we have found none. Cases from other jurisdictions, however, are plentiful. There are some differences, of course, in the facts alleged; for example, in some cases, the plaintiffs claim that they did not timely pursue claims against the abuser or the church because their memories of the sexual abuse were "repressed." For the most part, though, the facts are lamentably similar to those alleged in Doe's complaint: a young boy is befriended by a trusted member of the clergy who uses his righteous position and proximity to the young boy to satisfy his own base desires. In shame, the boy tells no one and suffers continuing emotional torment. Years after he is grown, the victim discovers that the offending clergy member was a serial abuser, that the church was aware of his behavior, and yet the cleric was retained in positions that enabled him to continue his abuse. A lawsuit is finally filed many years after the victim attained majority, and the threshold issue for the court is whether the applicable statute of limitations was tolled in the interim.

The primary differences in these cases are the theories employed to assert claims against the employer church. Many involve, at least in part, the issue of whether the plaintiff victim should be found to have had "inquiry notice" of the church's alleged knowledge of the offending clergy member's prior sexual abuse.

From our review of decisions from other jurisdictions, the apparent majority hold as a matter of law that the plaintiff, in the exercise of reasonable diligence, would have discovered the defendant church's knowledge of the clergy member's prior acts of abuse, and that the plaintiff's lawsuit against the church is time-barred. A minority of courts have denied the defendants' motions to dismiss, holding that a fact issue exists as to whether the plaintiff, in the exercise of reasonable diligence, would have discovered the church's alleged knowledge of the prior sexual abuse. We discuss exemplar cases in both categories and then apply the reasoning to the case at bar.

**1.  *Time-Barred as a Matter of Law***

---

[10] " '[A]ctual notice' is that notice which a plaintiff actually possesses; 'inquiry notice' is that notice which a plaintiff would have possessed after due investigation." ***Cevenini v. Archbishop of Wash.***, 707 A.2d 768, 771 (D.C. 1998) (quoting ***Diamond v. Davis***, 680 A.2d 364, 372 (D.C. 1996)).

A majority of courts considering lawsuits similar to the case at bar have held that the plaintiff, at the age of majority and in the exercise of reasonable diligence, would have learned that the employer church had knowledge of the clergy member's prior sexual abuse, and that therefore, as a matter of law, the statute of limitations was not tolled.

In *Mark K. v. Roman Catholic Archbishop of L.A.*, 79 Cal. Rptr. 2d 73 (Cal. Ct. App. 1998), the plaintiff alleged that Father Llanos sexually molested him in 1975 and 1976, when the plaintiff was 10 to 11 years old.[11] In approximately 1995, the plaintiff began to realize the connection between his childhood sexual abuse and his adult psychological illness. *Id.* at 75. The complaint was filed in 1996, against both Father Llanos and the Archbishop of Los Angeles. As to the Archbishop, the plaintiff alleged negligent supervision and retention, as well as breach of the church's "special fiduciary relationship" with the plaintiff. The plaintiff asserted the doctrine of equitable estoppel, alleging that the church was put on notice as early as 1973 of Father Llanos's inappropriate sexual behavior toward young boys. The plaintiff stated that he was not aware until 1996 that the church had been apprised of Father Llanos's proclivities before the plaintiff came in contact with him, but concealed the information from the plaintiff and failed to protect him. *Id.* at 75-76.

In its analysis, the *Mark K.* court noted that the case turned on whether the statute of limitations was tolled, and considered the discovery rule, fraudulent concealment, and estoppel.[12] *Id.* at 76-79. It stated the discovery rule as follows: "the statute of limitations begins to run when the plaintiff suspects or should suspect that [his] injury was caused by wrongdoing . . . [,]once the plaintiff 'has notice or information of circumstances to put a reasonable person on inquiry . . . .' " *Id.* at 77 (quoting *Jolly v. Eli Lilly &Co.*, 751 P.2d 923 (Cal. 1988)). The court emphasized: "Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, [he] must decide whether to file suit or sit on [his] rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; [he] cannot wait for the facts to find [him]." *Id.*

---

[11]*Mark K.* involved numerous plaintiffs with similar complaints. For simplicity, the Court discussed its analysis as applied to the lead plaintiff, as do we. *Mark K.*, 79 Cal. Rptr. 2d at 75.

[12]We note that, as to equitable estoppel and fraudulent concealment, the *Mark K.* court pointed out that the plaintiff asserted that, as his fiduciary, the church had a duty to disclose the prior accusations of sexual abuse against Father Llanos, and breached its duty by failing to come forward with the information. The court pointed out that the church had not concealed from the plaintiff the fact of his injury, and commented that his estoppel/fraudulent concealment tolling theory:

> begs the question. The wrongful conduct alleged against the church was its inaction in the face of the accusations against Father Llanos. Thus, what the church failed to disclose was merely evidence that the wrong had been committed. If plaintiff's approach were to prevail, then any time a tortfeasor failed to disclose evidence that would demonstrate its liability in tort, the statute of limitations would be tolled under the doctrine of concealment.

*Mark K.*, 79 Cal. Rptr. 2d at 79. Thus, the Court found that the complaint was time-barred. This is an argument worthy of consideration; however, given our holding in this appeal, we need not resolve it.

Applying that principle to the facts presented, the *Mark K.* court stated:

Plaintiff's failure to allege lack of knowledge or appreciation of Father Llanos's misconduct deprives him of any basis upon which to disclaim inquiry notice that the church was a potential tortfeasor. Plaintiff knew that Llanos was a priest of the church, thereby obligating plaintiff to determine, as with any employer whose employee has injured a third party, whether the church shouldered some responsibility for the misconduct of its priest.

*Id.* at 79 (citation omitted). It concluded that "Father Llanos's sexual misconduct put plaintiff on inquiry notice regarding the potential liability of the church for acts of its negligence or intentional misconduct . . . ." *Id.; see also Doe v. Archdiocese of Cincinnati*, 849 N.E.2d 268, 271 (Ohio 2006) (addressing the issue of when a victim of child sexual abuse must file suit against the perpetrator's employer, given that the victim, at the time of the abuse, knew the identity of the perpetrator, the employer of the perpetrator, and that a battery occurred); *Doe v. Archdiocese of Wash.*, 689 A.2d 634, 645 (Md. Ct. Spec. App. 1997).

*Meehan v. Archdiocese of Phila.*, 870 A.2d 912, 921 (Pa. Super. Ct. 2005), involved similar allegations of sexual abuse by a member of the Catholic clergy. The plaintiffs asserted that they did not discover that the archdiocese had knowledge of the cleric's pattern of abuse until 2002, when the Archdiocese of Philadelphia acknowledged allegations of sexual abuse against some priests, and the president of the United States Conference of Catholic Bishops published statements on the Church's response to the victims of the abuse.[13] *Id.* at 917-18. These plaintiffs maintained that they could not have discovered the role of the archdiocese due to the concealment of its knowledge, and emphasized that their claims against the archdiocese were independent from any claims against their abusers. They argued that a jury should determine whether they exercised reasonable diligence in investigating the cause of their injuries. *Id.* at 918, 920.

The *Meehan* court rejected this argument, emphasizing that the plaintiffs knew that they had been injured and knew the clergy member who was the primary cause of the injury:

The child abuse is the injury in this matter, not the alleged cover-up by the Archdiocese. . . . [The plaintiffs] are really claiming that they were unaware, not of their injury, but of a secondary cause of their injury (the primary cause being the individual who committed the abuse). . . .

---

[13]On June 13, 2002, the President of the United States Conference of Catholic Bishops stated:

We are the ones, whether through ignorance or lack of vigilance, or - God forbid - with knowledge, who allowed priest abusers to remain in ministry and reassign them to communities where they continue to abuse. We are the once who chose not to report the criminal actions of priests to the authorities, because the law did not require this. We are the ones who worried more about the possibility of scandal than in bringing about the kind of openness that helps prevent abuse. And we are the ones who, at times, responded to the victims and their families as adversaries and not as suffering members of the church.

*C.J.M. v. Archdiocese of Phila.*, 67 Pa. D. & C. 4th 474, 478 n.6 (Pa. Com. Pl. 2004).

Here, the plaintiffs knew they were injured, knew the identity of the primary cause of their injury, knew their abusers were employees of the Archdiocese . . . and knew the abuses took place on church property. . . . These facts alone were sufficient to put the plaintiffs on notice that there was a possibility that the Archdiocese had been negligent.

*Id.* at 921. The *Meehan* court thus held that the discovery rule did not toll the statute of limitations. *Id.*

The plaintiffs also claimed that the archdiocese had a fiduciary relationship with them and committed fraudulent concealment by remaining silent about its knowledge of the clergy members' abuse. The *Meehan* court emphasized that the plaintiffs had full knowledge that they had been abused and by whom they were abused:

[T]he essence of the plaintiffs' fraudulent concealment argument is that the defendants' general conduct and/or silence concealed from them an additional theory of liability for the alleged sexual abuse. "[T]his argument misses the mark . . . for a cause of action to accrue, the entire theory of the case need not be immediately apparent . . . . As soon as [the plaintiffs] became aware of the alleged abuse, they should also have been aware that the [defendants], as the priests' employers, were potentially liable for that abuse."

*Id.* at 922 (quoting *Kelly v. Marcantonio*, 187 F.3d 192, 201 (1ˢᵗ Cir. 1999)). Thus, the *Meehan* court concluded that the doctrine of fraudulent concealment likewise did not toll the statute of limitations. *Id.* at 922-23.

The plaintiffs' claims were also found to be time-barred in *Cevenini v. Archbishop of Wash.*, 707 A.2d 768 (D.C. 1998). In *Cevenini*, as in the other cases, the plaintiffs were sexually molested by a priest when they were teenagers in the mid-1970s. *Id.* at 770. In 1995, a newspaper published a series of articles disclosing that the archdiocese knew of the priest's pedophilic tendencies before he was assigned to the plaintiffs' church. The plaintiffs filed a lawsuit against the archbishop in 1995, alleging, *inter alia*, negligent hiring and supervision. *Id.* at 769. The plaintiffs maintained that they had no knowledge of any wrongdoing on the part of the archdiocese until publication of the newspaper articles. *Id.* at 770. They contended that the statute of limitations was tolled under the discovery rule and the doctrine of fraudulent concealment. *Id.* at 771.

The *Cevenini* court's analysis focused on whether, at the time they reached majority, the plaintiffs had "inquiry notice." It noted that even if the plaintiff "is not actually aware of each essential element of his cause of action," he could be charged with inquiry notice if he "knows of (1) an injury, (2) its cause, and (3) some evidence of wrongdoing." *Id.* at 771 (citations omitted). It emphasized: "The fact that [the plaintiff] did not [initially] comprehend the full extent of *all* possible sequelae does not matter, for the law of limitations requires only that he have inquiry notice of the existence of a *cause of action* for personal injury." *Id.* at 771 (quoting *Baker v. A. H. Robins*

*Co.*, 613 F. Supp. 994, 996 (D.D.C. 1985)). It declined to toll the statute of limitations, finding that when the plaintiffs reached majority,[14] they had an awareness of both mental and physical injuries, were aware that the cause in fact of the injuries was the sexual abuse, and had some evidence of wrongdoing. *Id.* at 772.

The plaintiffs argued, and the *Cevenini* court acknowledged, that the "critical event" was not the accrual of their claims against the priest, but rather the accrual of their claims against the archdiocese. *Id.* at 773. The court found that, under the facts alleged in the complaint, the plaintiffs' knowledge of misconduct by the priest placed them on notice of claims against the archdiocese. The court explained: "[T]he plaintiff's knowledge of wrongdoing on the part of one defendant did not cause accrual of his action against another, unknown defendant responsible for the same harm, *unless the two defendants were closely connected such as in a superior-subordinate relationship.*" *Id.* at 773 (quoting *Diamond*, 680 A.2d at 380). Because the plaintiffs were admittedly aware that the priest was the subordinate representative of the archdiocese, the *Cevenini* court found that "a reasonable plaintiff would have investigated his potential claims against the archdiocese at the same time that his claims accrued against its representative." *Id.* Thus, the court held that the plaintiffs' claims against the archdiocese accrued simultaneously with their claims against the priest, and were time-barred.[15] *Id.*

Thus, the majority of courts appear to have found that plaintiffs in Doe's position had inquiry notice, and that their claims were time-barred.[16] These courts have emphasized that, even if the plaintiff did not know that the church was a cause of the injury, the plaintiff knew that he had been injured by the clergy member and was obligated to investigate the responsibility of the cleric's employer. At that point in the analysis, most of these courts simply concluded that the plaintiff would have discovered the church's prior knowledge. However, the *Cevenini* court took its analysis one step further, finding that because the priest and the church were clearly connected, a reasonable plaintiff would have investigated claims against the predator priest, and against the church.

## 2. *Jury Issue*

In contrast, some courts considering the issue of the plaintiff's inquiry notice in comparable cases have denied the defendant's motion to dismiss, finding that it was for the jury to decide

---

[14]One plaintiff alleged that he had repressed memories, but the court found nevertheless that his cause of action accrued years before the 1995 newspaper article. *Cevenini*, 707 A.2d at 772.

[15]On the issue of fraudulent concealment, the *Cevenini* court held that, in addition to inquiry notice, the Archdiocese's failure to disclose information to the plaintiffs did not constitute "affirmative acts of concealment" necessary to support a finding of fraudulent concealment. *Cevenini*, 707 A.2d at 774. It stated" "[W]e are unwilling to hold that a failure to disclose information that has not even been requested constitutes fraudulent concealment." *Id.*

[16]In its appellate brief, the defendant Diocese relies heavily on *Doe v. Linam*, 225 F. Supp. 2d 731 (S.D. Tex. 2002). While the *Linam* court discusses the same tolling theories asserted in this case, the *Linam* plaintiff sued both the priest and the church, and the court focused on whether the plaintiff's injury was "inherently undiscoverable" because his psychological condition prevented him from linking his difficulties to the sexual abuse. *Doe*, 225 F. Supp. 2d. at 735. These two differences make the *Linam* court's analysis less applicable the facts of this case.

whether the plaintiff, in the exercise of reasonable diligence, would have discovered that the church was a cause of his injury.

In *A.L.M. v. Diocese of Allentown*, 68 Pa. D. & C. 4th 111 (Pa. Com. Pl. 2004), the plaintiff Catholic parishioners were sexually molested by clergy members when they were minors, between the years 1965 and 1982. In 2004, they filed suit against the diocese and the bishop, but not against the offending priests. Among other claims, the lawsuits alleged breach of fiduciary duty and negligent supervision. *Id.* at 114-15.

The defendants filed motions for judgment on the pleadings, asserting that the plaintiffs' claims were time-barred. In response, the plaintiffs noted that, in 2002, representatives of the Catholic Church disclosed knowledge of prior incidents of child sexual abuse by clergy members. They asserted that they were unable to discover that the Church was a cause of their injuries until the 2002 disclosures. To toll the two-year statute of limitations, the plaintiffs relied on the discovery rule and the doctrine of fraudulent concealment. *Id.* at 116-18.

In its analysis, the *A.L.M.* court noted that the test is the same under the discovery rule and fraudulent concealment: "when did the plaintiff know, or in the exercise of reasonable diligence when should he have known, of both the injury and its cause?" *Id.* at 126. It distinguished the plaintiffs' claims against the Church from claims based on the vicarious liability of an employer, emphasizing that an employer may be held vicariously liable for the negligent acts of his employee which cause injury to a third party, provided that the acts were committed during the course of and within the scope of his employment. *Id.* at 124. In response to the Church's argument that the plaintiffs must have known at the time they reached majority that they could have sued the Church, the *A.L.M.* court stated:

> However, the plaintiffs had no recourse against the Diocese or the bishops under a theory of vicarious liability. The Pennsylvania Superior Court held in [*R.A. v. First Church of Christ*, 748 A.2d 692, 699 (Pa. Super. 2000)] that a church is not vicariously liable for the conduct of its minister where the minister sexually abused a minor living in his neighborhood. The court reasoned that where an employee acts in an outrageous manner which is unrelated to the performance of his job, the actions are outside the scope of employment and the employer is not vicariously responsible.

> The facts alleged in the present case are very similar to the scenario in *R.A.* The acts of sexual abuse committed by the offending priests were, if true, clearly outrageous and outside the scope of their priestly duties. Thus, the plaintiffs could not have pursued claims against the defendants at the time of the abuse based upon vicarious liability.

*Id.* Thus, the *A.L.M.* court found that, at the time the plaintiffs reached majority, any claims against the church asserting vicarious liability would have been dismissed. From this, the court concluded that the issues of when the plaintiffs should have been aware of their claims against the church, and

whether the church fraudulently withheld information, could not be resolved on the face of the complaint. *Id.* at 126-27. Consequently, the church's motion to dismiss was denied.

Similarly, in *Matthews v. Roman Catholic Diocese of Pittsburgh*, 67 Pa. D. & C.4th 393 (Pa. Com. Pl. 2004), the plaintiff alleged that he was sexually molested by a priest in his church in 1989, when he was twelve years old. In 2002, the plaintiff learned that the Catholic Church, and his diocese, had a policy of shielding and protecting pedophilic priests. Until then, the plaintiff maintained, he had no reason to suspect that the diocese would have permitted the offending cleric to continue to serve as a priest once it discovered that he had been sexually abusing children. In 2004, the plaintiff filed a lawsuit against the diocese, asserting claims based on allegations that the diocese, after receiving complaints regarding the priest's sexual abuse of other children, permitted him to continue serving as a priest and having contact with minor parishioners. The plaintiff did not assert claims against the diocese based on the doctrine of respondeat superior, and did not sue the individual priest. *Matthews*, 67 Pa. D. & C.4th at 394-96.

The defendant church filed a motion for judgment on the pleadings, asserting that the plaintiff's claims were barred by the two-year statute of limitations. *Id.* at 394, 396. In response, the plaintiff relied on the discovery rule and the doctrine of fraudulent concealment, claiming that he had no reason to know that the church was a cause of his injuries until 2002, when the church disclosed its role in concealing incidents of child sexual abuse committed by priests. The plaintiff maintained that the issue of whether he had inquiry notice was for the jury to decide. *Id.* at 396-97.

The *Matthews* court reviewed numerous cases, including *Mark K. v. Roman Catholic Archbishop of L.A., supra*, and *A.L.M. v. Diocese of Allentown*, *supra*. After doing so, the *Matthews* court stated:

> The case law upon which the defendants rely holds that the discovery rule may not be invoked because a person injured by an employee should have reason to suspect that the employer may also have independent responsibility for the injury. I did not find this rationale to be persuasive when the employer is a church which the plaintiff attends and the employee is engaging in activity that may be reasonably viewed as conduct that the church could never tolerate. A jury may find that there is a loud ring of truth to plaintiff's statement that he and his family never approached Diocesan officials to ask whether they had knowingly assigned to their church, to work directly with the parishioners, including young boys, a priest with a history of sexually molesting children, because it would never cross their minds that the church would do so. Under the law, there is no duty of inquiry where there is no reason to suspect that a party's involvement contributed to the injuries; it is for the jury to decide whether the plaintiff exercised reasonable diligence in discovering the cause of his injury unless reasonable minds would not differ in finding that plaintiff failed to exercise reasonable diligence. The argument of counsel for the defendants – reasonable minds must find that in 1989 plaintiff and his family should have considered the possibility that the Diocese had assigned to plaintiff's church as its priest a person whom church officials knew to have engaged in sexual activity with

-16-

children – is based on a portrayal of the church that a jury may not be prepared to accept.

*Id.* at 407.  Thus, the *Matthews* court found that a jury could reasonably find that the plaintiff, in 1989, had no reason to inquire as to whether the church had prior knowledge of the priest's pedophilic activities, and so denied the church's motion for judgment on the pleadings.  *Id.; see also Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 432 (2d Cir. 1999) (affirming trial court's denial of the Diocese's motion for judgment as a matter of law).

Thus, some courts have concluded that it was for the jury to decide whether the plaintiff, at the time he reached majority and in the exercise of reasonable diligence, would have discovered the church's alleged knowledge of prior instances of child sexual abuse by the offending cleric.  On this basis, these courts denied the defendants' motions for dismissal on the pleadings.  The *A.L.M.* court did so by finding that, had the plaintiff filed a lawsuit against the church for vicarious liability, its lawsuit would have been dismissed on the pleadings, without benefit of discovery.

### Application to Facts in This Case

We now consider the reasoning in these cases as applied to the facts in the case at bar, focusing on the issue of Doe's inquiry notice.

Doe insists that the statute of limitations should be tolled because, "regardless of what other information Plaintiff may have possessed at the time of his abuse, Plaintiff did not have sufficient facts to bring a negligence claim against the Diocese . . . as he did not know the facts demonstrating that the Diocese was negligent."

We must reject this argument.  As in *Meehan*, Doe's child abuse was the injury, not the Diocese's "alleged cover-up."  *Meehan*, 870 A.2d at 921.  In reality, Doe claims that he was "unaware, not of [his] injury, but of a secondary cause of [his] injury (the primary cause being the individual who committed the abuse)."  *Id.* at 920.  As in *Mark K.*, Doe knew that Father DuPree was a priest of the Diocese, obligating him "to determine, as with any employer whose employee has injured a third party, whether the church shouldered some responsibility for the misconduct of its priest."  *Mark K.*, 79 Cal. Rptr. 2d at 79.

We cannot, however, simply accept the Diocese's repeated conclusory assertion that Doe's knowledge of his abuse, the identity of his abuser, and the relationship between the abuser and the Diocese gave Doe sufficient knowledge to put him on inquiry notice of a possible claim against the Diocese.  In a number of the cases cited above, the court adopted precisely this analysis.  This equates to a finding in essence that, had Doe pursued *any* claim against the Diocese at the time he reached majority, he would have learned through discovery that there were prior instances of child sexual molestation by Father DuPree and that the Diocese had knowledge of such instances.  This analysis, however, seems insufficient; we think it is necessary to examine in some detail what Doe knew at the time he reached majority, and follow the thread of what would have happened had Doe pursued a claim against the Diocese in 1987.

-17-

In 1987, Doe knew that he had been abused by Father DuPree as a minor, and either knew or could have easily ascertained that Father DuPree was employed by the Diocese. Doe had no actual knowledge that, at the time of Doe's abuse, the Diocese had information on Father DuPree's proclivities and failed to inform Doe or protect him from Father DuPree.

With this set of facts, the only claim that Doe could have asserted against the *Diocese* at the time was for vicarious liability, under the doctrine of *respondeat superior*. Had Doe filed such a lawsuit against the Diocese, could he then have conducted discovery and learned that there were other minor victims of Father DuPree's abuse, and that the Diocese had prior knowledge of them?

In Tennessee, for an employer to be held liable under the doctrine of *respondeat superior*, the plaintiff must prove that the employee was acting within the course and scope of his employment when the injury occurred. ***Davis v. Modine Mfg. Co.***, 979 S.W.2d 602, 607 (Tenn. Ct. App. 1998) (citations omitted). The question of whether the employee was acting within the course and scope of his employment is "ordinarily one of fact for the determination of the jury, *except where the departure from the [employer's] business is of marked and decided character.*" ***Home Stores, Inc. v. Parker***, 166 S.W.2d 619, 622 (Tenn. 1942) (emphasis added); ***Davis***, 979 S.W.2d at 608.

We find no reported Tennessee cases applying the doctrine of *respondeat superior* to a clergy member accused of child sexual abuse. Cases from other jurisdictions on this issue have had mixed results. One commentator has noted that sexual batteries are generally deemed to be outside the scope of employment unless the tortfeasor employee used his employment to commit the tort, and adds: "Notwithstanding the fact that allegations of a cleric's sexual misconduct often include situations where the cleric used his or her position in the Church to gain the trust of and access to a victim, most courts have been unwilling to apply this exception to clergy sexual abuse cases." Jana Satz Nugent, Note, *A Higher Authority: the Viability of Third Party Tort Actions Against a Religious Institution Grounded on Sexual Misconduct by a Member of the Clergy*, 30 FLA. ST. U. L. Rev. 957, 968 (2003); *see also, e.g., **Tichenor v. Roman Catholic Church of the Archdiocese of New Orleans***, 32 F.3d 953, 960 (5th Cir. 1994) ("It would be hard to imagine a more difficult argument than that [a priest's] illicit sexual pursuits were somehow related to his duties as a priest . . . ."); ***A.L.M. v. Diocese of Allentown***, 68 Pa. D. & C.4th at 124-25 (finding that, under Pennsylvania law, the offending priest's sexual abuse would have been deemed outside the scope of employment). The court in ***A.L.M.*** concluded that the plaintiff could not have pursued a lawsuit against the church based on vicarious liability, and thus could not have discovered that the church was a separate cause for his injury. ***A.L.M.***, 68 Pa. D. & C. 4th at 123-25.

We need not decide at this juncture whether, in 1987, a Tennessee court would have held that Father DuPree's alleged sexual abuse of Doe was outside the course and scope of Father DuPree's employment. It is enough that the issue is unclear, and there is a substantial possibility that, had Doe asserted a claim of *respondeat superior* against the Diocese in 1987, the Diocese would have been granted a judgment on the pleadings, precluding Doe from conducting discovery which could have led to other possible claims. Absent such discovery, there would have been no way for Doe to learn that the Diocese had been aware that Father DuPree was a sexual predator. Therefore, we are

unwilling to hold that, as a matter of law, had Doe filed a lawsuit *only* against the Diocese, he would have learned of the Diocese's knowledge of prior instances of child abuse.

Our analysis, however, does not end there. We must also consider the analysis utilized in *Cevenini*. In *Cevenini*, the court held that the plaintiff's knowledge of wrongdoing on the part of the *priest* placed the plaintiff on notice of claims against the *church*, because the priest and the church were closely connected in a superior-subordinate relationship. *Cevenini*, 707 A.2d at 773. The *Cevenini* court explained:

> In some circumstances . . . the relationship of the defendants, together with these facts, may establish as a matter of law that a reasonable plaintiff with knowledge of the misconduct of one would have conducted an investigation as to the other. If that investigation would, as a matter of law, have revealed some evidence of wrongdoing on the part of the other defendant, then the cause of action will have accrued as to both.
>
> Thus . . . while knowledge of misconduct on the part of one defendant will not automatically create inquiry notice of claims against a potential co-defendant, such notice may be charged to the plaintiff if (1) a reasonable plaintiff would have conducted an investigation ast o the co-defendant, and (2) such an investigation would have revealed some evidence of wrongdoing.

*Id.* (quoting *Diamond*, 680 A.2d at 380). The *Cevenini* court concluded that a reasonable plaintiff would have conducted an investigation of both the priest and the co-defendant church, and that such an investigation would have revealed the church's knowledge of prior child sexual abuse by the priest.

Should we hold, then, that a reasonable person in Doe's position in 1987 would have filed a lawsuit against a *separate* potential co-defendant, namely Father DuPree? In this case, Doe would have been aware in 1987 that he had a claim against Father DuPree. Without question, Father DuPree and the Diocese are closely connected, in a superior-subordinate relationship. Unlike a *respondeat superior* claim against the Diocese, there is no reason to believe that a lawsuit by Doe against Father DuPree at that time would have been repelled by a court at the pleading stage, prior to discovery. Had Doe filed a lawsuit against Father DuPree, he would have had the opportunity to conduct routine discovery, which would almost certainly have involved questions regarding prior child sexual abuse by Father DuPree, as well as the Diocese's knowledge of such prior abuse. This would have provided a mechanism for Doe to learn that the Diocese had been negligent.

We find no Tennessee cases comparable to *Cevenini* or the cases cited therein. But we think that the rationale makes sense. We are unwilling to hold that knowledge of misconduct on the part of one defendant *automatically* results in a finding of inquiry notice of claims against a potential co-defendant. However, in appropriate circumstances, the plaintiff should be charged with inquiry notice of what an investigation of the potential co-defendant would have revealed. This is

appropriate where the potential co-defendants are closely connected, as with an employer/employee relationship. We therefore adopt the rationale set forth in *Cevenini*, *supra*, and *Diamond*, *supra*.

Had the Diocese been asked about Father DuPree's prior offenses in 1987, we cannot know whether the Diocese would have been forthcoming in response to such inquiries. As in *Cevenini*, had Doe requested such information and been refused, "our decision might be different." *Cevenini*, 707 A.2d at 774. But the tolling theories relied upon by Doe are only available to a plaintiff who has exercised reasonable diligence.[17] "[T]he plaintiff must go find the facts; [he] cannot wait for the facts to find [him]." *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1110-11 (Cal. 1988), *quoted in Mark K.*, 79 Cal. Rptr. 2d at 77.

Therefore, under all of these circumstances, we find that plaintiff Doe, in the exercise of reasonable diligence, would have learned in 1987 about his right of action against the Diocese for negligent supervision and retention of Father DuPree. Consequently, we must conclude that Doe's complaint against the Diocese is barred under the one-year statute of limitations, and that the trial court erred in denying the Diocese's Rule 12.02(6) motion to dismiss.

The decision of the trial court is reversed. Costs on appeal are assessed against Appellee John Doe, for which execution may issue if necessary.

_____

HOLLY M. KIRBY, JUDGE

---

[17]We note that Doe makes the rather cryptic allegation in his complaint that "[d]espite the exercise of reasonable diligence, [Doe] only recently learned of the [Diocese's] negligent conduct." Doe's conclusory allegation that he exercised reasonable care and diligence is not sufficient to prevent dismissal of the complaint as time-barred if the rest of the complaint belies the allegation. *See Slavin v. Morgan Stanley & Co., Inc.*, 791 F. Supp. 327, 331 (D. Mass. 1992); *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 921 (Cal. 2005); *Saliter v. Pierce Bros. Mortuaries*, 146 Cal. Rptr. 271, 274-75 (Cal. Ct. App. 1978).