# IN THE COURT OF APPEALS OF TENNESSEE
## AT MEMPHIS
### February 23, 2010 Session

## NORMAN REDWING v. THE CATHOLIC BISHOP FOR THE DIOCESE OF MEMPHIS

### Appeal from the Circuit Court for Shelby County
### No. CT-005052-08      D'Army Bailey, Judge

### No. W2009-00986-COA-R10-CV - Filed May 27, 2010

Plaintiff filed an action against the Catholic Bishop for The Diocese of Memphis, asserting the Diocese was liable for damages arising from the negligent hiring, retention and supervision of a priest, who Plaintiff alleged abused him when he was a child. The Diocese moved to dismiss for lack of subject matter jurisdiction and on the grounds that the statute of limitations prescribed by Tennessee Code Annotated § 28-3-104 had expired. The trial court denied the motions. It also denied the Diocese's motion for permission to seek an interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. We granted the Diocese's motion for extraordinary appeal under Rule 10. We affirm the trial court's judgment with respect to subject matter jurisdiction over Plaintiff's claim of negligent supervision, but hold that Plaintiff's claims of negligent hiring and negligent retention are barred by the ecclesiastical abstention doctrine. We reverse the trial court's judgment with respect to the expiration of the statute of limitations.

### Tenn. R. App. P. 10 Extraordinary Appeal by Permission; Judgment of the Circuit Court Reversed and Remanded

DAVID R. FARMER, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., joined. HOLLY M. KIRBY, J., filed a dissenting opinion.

John H. Dotson and Casey Shannon, Memphis, Tennessee, for the appellant, The Catholic Bishop for the Diocese of Memphis.

Gary K. Smith and Karen M. Campbell, Memphis, Tennessee, for the appellee, Norman Redwing.

**OPINION**

This lawsuit arises from the alleged sexual abuse of Plaintiff by a priest of the Roman Catholic Church ("the Church") in Memphis in the early to mid-1970's. In August 2008, Plaintiff Norman Redwing (Mr. Redwing) filed a complaint alleging negligence against The Bishop for the Diocese of Memphis ("the Diocese") in the Circuit Court for Shelby County. He amended his complaint in October 2008. In his amended complaint, Mr. Redwing asserted the Diocese was liable for damages arising from the negligent hiring, supervision and retention of Father Milton Guthrie ("Father Guthrie"). Mr. Redwing alleged that Father Guthrie, who served at Holy Names Catholic Church from 1971 to 1977, had committed "horrific acts of childhood sexual abuse" against him. He alleged that "[o]fficials and religious figures at the highest levels of 'The Church' are well aware of the attraction to The Church to those who will do serious harm to minors[,]" and that "[i]nstead of exercising due care and diligence to protect minors . . . from . . . serious harm . . . The Church gives clergy complete discretion and freedom to have personal, private and spiritual encounters with minors." He asserted that the Church has gone to great lengths to protect "its own[,]" and that "[i]t is the practice of the Roman Catholic Church, through its cardinals, bishops, priests and other official agents, to conceal instances of child sexual abuse and complaints by victims." He further asserted that officials in the Diocese "monitored, supervised, trained, counseled and employed or otherwise exercised control over Father Guthrie's secular and non-secular activities involving the public, minors and his brotherly duties" and "have thus ratified, approved and adopted as their own the conduct of Father Guthrie through such supervision, training, counseling, control and employment." Mr. Redwing asserted that the Diocese and/or its Bishop knew or should have known that Father Guthrie was "a dangerous sexual predator with a depraved sexual interest in young boys." He additionally stated that, when the alleged abuse occurred, he and his family were unaware of the Diocese's knowledge of Father Guthrie's "sexual interest in young boys" and were "misled by the Diocese with regard to, [its] knowledge of Father Guthrie's history and propensity for committing sexual abuse upon minors." Mr. Redwing further alleged that the Diocese "took steps to protect Father Guthrie, conceal the Diocese's own wrongdoing in supervising Father Guthrie, and prevent Norman Redwing and other victims of Father Guthrie from filing civil lawsuits." He asserted that the Diocese breached its fiduciary duty to investigate, warn and protect against the abuse; to disclose its awareness of likely harm; to disclose its own negligence with respect to hiring, supervision, assignment and retention of Father Guthrie; and to provide a safe environment. Mr. Redwing asserted that the Diocese "actively and fraudulently concealed information pertinent and relevant to claims relating to the sexual abuse in this matter for the purpose of protecting itself from civil liability and evading same."

Mr. Redwing asserted that he had suffered severe psychological injuries as a result of the sexual abuse committed by Father Guthrie, including loss of faith, mood swings, intimacy

problems, emotional disconnection in relationships, anxiety, rage, and the loss of enjoyment of life. He asserted a cause of action for negligence, submitting that the Diocese owed him a duty to use reasonable care to ensure his "safety, care, well-being and health . . . while he was under the care, custody or in the presence of the Diocese and/or its agents." Mr. Redwing asserted that the Diocese had breached its duty, and that the breach "encompassed the hiring, retention and/or supervision of Father Guthrie and otherwise providing a safe environment[.]" He alleged that his injuries were proximately caused by the negligence of the Diocese and that the Diocese had actual or constructive knowledge that Father Guthrie was a threat to minors. Mr Redwing submitted that, "[d]espite the exercise of reasonable diligence, [he] only recently learned of the Diocese's negligent conduct" and of the "causal connection between his childhood sexual abuse and the damages he sustained." He prayed for a trial by jury, compensatory and punitive damages, attorney's fees and costs.

The Diocese filed a motion to dismiss based on lack of subject matter jurisdiction and expiration of the statute of limitations. In its motion, the Diocese asserted that the trial court did not have subject matter jurisdiction to adjudicate Mr. Redwing's claims of negligent hiring, retention and supervision under the ecclesiastical abstention doctrine arising from the First Amendment of the United States Constitution. It additionally asserted that Mr. Redwing's action was barred by the one-year statute of limitations set-forth in Tennessee Code Annotated § 28-3-104 where Mr. Redwing attained the age of majority in 1978 and filed his complaint 29 years after expiration of the limitations period.

Following a hearing in April 2009, the trial court denied the Diocese's motions. In its order, the trial court found that "the record [did] not establish as a matter of law that sufficient facts as to defendant's potential liability could have been known more than a year prior to the filing of" the Complaint. The Diocese filed a motion for permission to seek an interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. Following a hearing on May 8, 2009, the trial court denied the Diocese's motion by order entered on May 13, 2009.

On May 14, the Diocese filed an application in this Court for an extraordinary appeal pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure. We granted the Diocese's application on July 1, 2009, and oral argument was heard by this Court in February 2010. Our review of this matter is confined to two issues, as we state them:

(1)     Whether the trial court erred by denying the Diocese's motion to dismiss for lack of subject matter jurisdiction under the ecclesiastical abstention doctrine.

(2)    Whether the trial court erred by denying the Diocese's motion to dismiss where the applicable statute of limitations had expired 29 years before Mr. Redwing filed his complaint.

### *Standard of Review*

The issues before us in this appeal under Rule 10 of the Tennessee Rules of Appellate Procedure present questions of law. We review the trial court's judgment on questions of law, and its application of the law to the facts, *de novo*, with no presumption of correctness. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). Similarly, we review mixed questions of law and fact *de novo*, with no presumption of correctness. *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). A Tennessee Rule of Civil Procedure 12.02(6) motion to dismiss for failure to state a claim tests only the legal sufficiency of the complaint itself, and not the weight of the evidence. *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 311 (Tenn. 2005). The motion should be granted only when the allegations of the complaint, when considered to be true, are not sufficient to constitute a cause of action as a matter of law. *Id.* It should be denied unless it appears that the plaintiff cannot establish any facts in support of the claim that would warrant relief. *Id.*

### *Discussion*

This dispute requires us to first determine whether the civil courts of this State have subject matter jurisdiction to adjudicate Mr. Redwing's claims of negligent hiring, retention and supervision under the ecclesiastical abstention doctrine. It further requires us to determine whether, assuming jurisdiction, the statute of limitations should be tolled in this case, which Mr. Redwing filed nearly 30 years after attaining the age of majority.

### *Subject Matter Jurisdiction*

Subject matter jurisdiction is conferred by the constitution and statutes and concerns the authority of the court to adjudicate a dispute. *Haley v. Univ. of Tennessee at Knoxville*, 188 S.W.3d 518, 522 (Tenn. 2006). Orders of a court acting without subject matter jurisdiction are void and may be collaterally attacked. *County of Shelby v. City of Memphis*, 365 S.W.2d 291, 292 (Tenn.1963); *Riden v. Snider*, 832 S.W.2d 341, 343 (Tenn. Ct. App.1991). Subject matter jurisdiction cannot be waived. *Meighan v. U.S. Sprint Commc'ns Co.*, 924 S.W.2d 632, 639 (Tenn. 1996).

We begin our discussion of whether the trial court has subject matter jurisdiction to adjudicate this case with the long-recognized constitutional premise that courts will not become involved in matters of religious doctrine, governance or administration, policy or

practice, or in "'any matter not affecting a property or civil right.'" *Bentley v. Shanks*, 348 S.W.2d 900, 903 (Tenn. Ct. App. 1960)(quoting *Lewis v. Partee*, 62 S.W. 328, 333 (Tenn. Ch. App. 1901)). We previously have examined the history and evolution of this premise in depth, and it is not necessary to repeat that discussion here. *See, e.g., Anderson v. Watchtower Bible and Tract Soc'y of New York, Inc.*, No. M2004-01066-COA-R9-CV, 2007 WL 161035 (Tenn. Ct. App. Jan. 19, 2007). We reiterate that, grounded in our nation's belief in the separation of church and state and rooted in the First and Fourteenth Amendments to the United States Constitution, the ecclesiastical abstention doctrine precludes the adjudication of disputes requiring extensive inquiry into matters of "ecclesiastical cognizance." *Id.* at *5 (quoting *Burgess v. Rock Creek Baptist Church*, 734 F.Supp. 30, 31 (D.D.C.1990)(citing *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709-10 (1976)). Through the First and Fourteenth Amendments, our government "'has secured religious liberty from the invasion of the civil authority.'" *Id.* (quoting *Watson v. Jones*, 80 U.S. 679, 730 (13 Wall.)(1872)). With this fundamental premise in mind, we turn to whether the civil courts have jurisdiction to adjudicate Mr. Redwing's action.

The courts which have addressed this question, including the courts of our neighboring sister jurisdictions, are divided on whether the ecclesiastical abstention doctrine is applicable to questions of negligent hiring, retention and supervision.[1] The Missouri Court of Appeals recently held that, under the Missouri Supreme Court's holding in *Gibson v. Brewer*, 952 S.W.2d 239 (Mo. banc 1997), the ecclesiastical absentention doctrine bars tort claims against religious institutions based on negligence in hiring, retaining, and supervising sexually abusive clerics. *Doe v. Roman Catholic Archdiocese of St. Louis*, No. ED 93007, 2010 WL 623698, at * 4 (Mo. Ct. App. Feb. 23, 2010). The Supreme Court of Mississippi, on the other hand, has held that neither the establishment clause nor the free exercise clause of the First Amendment deprive the state courts of subject matter jurisdiction over the claims. *Roman Catholic Diocese of Jackson v. Morrison*, 905 So.2d 1213, (Miss. 2005).

Although the parties in the case before us and much of the case law treat these claims as a single cause of action, we observe that the claims are, in fact, multi-faceted. The decision of whom to hire and retain is severable from the act of supervision. Accordingly, whether the civil courts may exercise jurisdiction over matters of whom the Diocese may call to and retain in the priesthood presents an issue distinct from that of whether the courts may adjudicate claims involving the Diocese's duty to supervise clergy insofar as matters not implicating questions of doctrine, theology, polity or governance are concerned. Accordingly, we turn first to whether Mr. Redwing's claims of negligent hiring and negligent retention are barred by the ecclesiastical abstention doctrine.

"The relationship between an organized church and its ministers is its lifeblood." *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972). Neither the legislatures nor the judiciary may

---

[1] *See Roman Catholic Diocese of Jackson, Mississippi v. Morrison*, 905 So.2d 1213, Appendix A and B, (Miss. 2005) for a survey of the holdings of our sister jurisdictions.

interfere with the regulation of church administration or operation, or matters concerning the appointment of clergy. *Kreshick v. St. Nicholas Cathedral*, 363 U.S. 190, 191 (1960); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 107-108, 116 (1952). Although the courts may exercise jurisdiction over disputes involving civil or property rights, they may do so only where the issues may be resolved using neutral principles of law that are distinct from matters requiring the examination of church doctrine or polity. Judicial intervention is not permitted where the underlying dispute is one of religious doctrine or church policy or governance. *Serbinan Eastern Orthodox Diocese v. Milivojevich*, 426 U. S. 696 (1976).

We must agree with the Diocese that the exercise of jurisdiction over matters pertaining to its decision of whom to hire and retain as a priest or clergyman would require an extensive entanglement into matters of religious doctrine or polity. Accordingly, the court may not exercise jurisdiction over Mr. Redwing's cause of action insofar as it is based on claims of negligent hiring and negligent retention of Father Guthrie.

We next turn to whether the civil courts may exercise jurisdiction over Mr. Redwing's claim based on negligent supervision. As we have noted, the abstention doctrine is applicable only to matters that require the courts to examine matters of religious belief or practice. "'[N]ot every civil court decision . . . jeopardizes values protected by the First Amendment.'" *Anderson v. Watchtower Bible and Tract Society of New York, Inc.*, No. M2004-01066-COA-R9-CV, 2007 WL 161035, at *6 (Tenn. Ct. App. Jan. 19, 2007)(quoting *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449 (1969)). If a court can adjudicate a dispute by applying neutral principles of law and without becoming unduly entangled in matters of doctrine or with questions that are essentially religious, the First Amendment does not prohibit adjudication of the matter. *Id.* (citing *Milivojevich*, 426 U. S. at 710; Jones v. Wolf, 443 U.S. 595, 604 (1979)).

The Diocese does not assert that the sexual abuse of minors is part of any Church doctrine or policy. [2] On the contrary, we note that the Church has adopted policies and procedures to address

---

[2]Although not an issue in this case, we note that state interference with religious practices has long been allowed where there is a compelling state interest. The Supreme Court more recently has held that state interference may be permitted in matters involving neutral principles of law.

In *Sherbert v. Verner*, 374 U.S. 398 (1963), the Supreme Court held that the state may interfere with religious practice only where a compelling state interest is implicated in the regulation of public safety, peace and order. *Id* at 403. It reiterated the compelling interest standard in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), opining: "[t]he essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Id*. at 215.

In 1990, the Court adopted the "neutral principles of law" standard, stating:

We have never held that an individual's religious beliefs excuse him from compliance with
(continued...)

the admittedly shocking and extensive abuse of children in the Church.[3]  Rather, it asserts that adjudication of this claim would require the courts to establish the standard of care applicable to the

[2](...continued)

an otherwise valid law prohibiting conduct that the State is free to regulate.  On the contrary, the record of more than a century of our free exercise jurisprudence contradicts that proposition.  As described succinctly by Justice Frankfurter in *Minersville School Dist. Bd. of Ed. v. Gobitis*, 310 U.S. 586, 594-595, 60 S.Ct. 1010, 1012-1013, 84 L.Ed. 1375 (1940): "Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs.  The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities (footnote omitted)."  We first had occasion to assert that principle in *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878), where we rejected the claim that criminal laws against polygamy could not be constitutionally applied to those whose religion commanded the practice.  "Laws," we said, "are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices . . . .  Can a man excuse his practices to the contrary because of his religious belief?  To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself."  *Id.* at 166-167.

. . . the right of free exercise does not relieve an individual of the obligation to comply with a "valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *United States v. Lee*, 455 U.S. 252, 263, n. 3, 102 S.Ct. 1051, 1058, n. 3, 71 L.Ed.2d 127 (1982) (STEVENS, J., concurring in judgment); see *Minersville School Dist. Bd. of Ed. v. Gobitis*, supra, 310 U.S., at 595, 60 S.Ct., at 1013 (collecting cases).

*Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878-879 (1990).

In 1993, Congress responded by enacting the Religious Freedom Restoration Act ("RFRA"). Codified at 42 U.S.C. § 2000bb, the purpose of the RFRA was to restore the compelling interest test set out in *Sherbert v. Verner* and *Wisconsin v. Yoder*.  42 U.S.C. § 2000bb(b).  It prohibited any government from substantially burdening a person's exercise of religion, "even if the burden result[ed] from a rule of general applicability," 42 U.S.C. § 2000bb-1(a), except when the government "demonstrat[ed] that application of the burden to the person-(1) [furthered] a compelling governmental interest; and (2) [was] the least restrictive means of furthering that . . . interest." § 2000bb-1(b).

In 1997, the Supreme Court opined that "Congress' power under § 5 [of the Fourteenth Amendment], extends only to 'enforc[ing]' the provisions of the Fourteenth Amendment." *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997).  The Court held that RFRA "contradict[ed] vital principles necessary to maintain separation of powers and the federal balance." *Id.* at 536.  The Court struck down the RFRA as applied to the states.  The RFRA continues to be applicable to Federal law. *See Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418 (2006).

[3]See www.vatican.va/resources/resources guide-CDF-procedures_en.html_

Bishop in his capacity as supervisor of the Diocese's priests. It submits that this involves an impermissible governmental entanglement in an essentially religious question, the question of the relationship between the Bishop and the priests serving the Diocese. Mr. Redwing, on the other hand, asserts his claim can be adjudicated without extensive entanglement in religious doctrine or questions of policy. He submits that neutral principles of law regarding negligence are applicable to this case, and that no Church doctrine or principle will be burdened if his lawsuit is allowed to proceed. Mr. Redwing argues that the negligence of the Diocese in this matter can be measured against secular legal standards that neither implicate nor affect Church theology, doctrine or polity.

We agree with Mr. Redwing. As noted, the Diocese does not argue that Father Guthrie's alleged acts of child abuse are connected to religious doctrine, theology or policy. Rather, the Diocese asserts that the courts may not impose a duty on the Bishop with respect to the supervision of the Diocese's priests. To the extent that the imposition of such a duty would impact the Bishop's supervision of a priest's acts in matters of faith or doctrine, we must agree. However, this lawsuit implicates no doctrinal, theological, policy or internal administrative matter. Rather, it pertains only to the Diocese's duty to safeguard the physical safety of the children in its care. Although the Diocese may hire and retain whomever it chooses as a priest, forgive whatever sins or shortcomings that priest may have, and supervise a priest's duties insofar as doctrinal or theological matters are concerned in whatever manner it chooses, it may not hide behind the First and Fourteenth Amendments to avoid imposition of a civil duty of care to safeguard children against sexual abuse by its employees, including its priests.

Clearly, the Diocese's duty to supervise its priests so as to prevent instances of child abuse can be imposed using neutral principles of law and without resort to or entanglement in matters of doctrine, theology or polity. We must agree with the Supreme Court of Mississippi that

> the cloak of religion, which does not shield religious institutions from civil responsibility for fraud or breach of contract, surely cannot serve to shield such institutions from civil responsibility for more abhorrent conduct such as sexual molestation of a child. Nor should it shield those who fail in their duty to protect children from it.

*Roman Catholic Diocese of Jackson, Mississippi v. Morrison*, 905 So.2d 1213, 1237 (Miss. 2005).

As we previously have stated, although the law cannot interfere with matters of religious doctrine or belief, it may interfere with conduct even when that conduct is motivated by religious doctrine when a compelling state interest is implicated. *State of Tennessee ex rel. Comm'r of Transp. v. Medicine Bird Black Bear White Eagle*, 63 S.W.3d 734, 762 (Tenn. Ct. App. 2001). "Some religious acts and practices by individuals must yield to the common good." *Id.* We cannot fathom a more compelling state interest than the protection of children against sexual abuse. We can imagine no more neutral principle of tort law than that which imposes a duty upon an employer to supervise its employees in a manner designed to safeguard against the sexual abuse of minors.

-8-

In this case, Mr. Redwing's claim for negligent supervision may be adjudicated using neutral tort principles and without inquiry into ecclesiastical matters. We agree with the trial court that it has subject matter jurisdiction to adjudicate this claim.

### *Statute of Limitations*

We next turn to whether the trial court erred by determining that the one-year statute of limitations set-forth in Tennessee Code Annotated § 28-3-104 was tolled in this case where Mr. Redwing filed his complaint nearly 30 years after attaining of the age of majority. As noted above, in his amended complaint, Mr. Redwing asserted that, "[d]espite the exercise of reasonable diligence [he] only recently learned of the Diocese's negligent conduct" and of the "causal connection between his childhood sexual abuse and the damages he sustained." In its order denying the Diocese's motion to dismiss based on the statute of limitations, the trial court stated that "the record does not establish as a matter of law that sufficient factors as to defendant's potential liability could have been known more than a year prior to the filing of this lawsuit." Upon review of the record in this cause, we must disagree.

Mr. Redwing relies on *Doe v. Catholic Bishop for the Diocese of Memphis*, No. W2007-01575-COA-R9-CV, ---- S.W.3d ----, 2008 WL 4253628 (Tenn. Ct. App. 2008), *perm. app. denied* (Tenn. Mar. 16, 2009), for the proposition that the statute of limitations is tolled in this case where the Diocese and the Church world-wide concealed numerous instances of sexual abuse of minors by priests. Although in *Doe* we held that the statute of limitations was not tolled in that case, Mr. Redwing argues his action differs from *Doe.* In his complaint, he stated that "despite diligent inquiry, the Plaintiff only recently learned that the Diocese's negligence caused his abuse." In his brief to this Court, Mr. Redwing submits, "[a]dditionally, after finding out about the priest's abuse of minors, the Diocese actively took steps to conceal the abuse in order to protect the priest, conceal the Diocese's own wrongdoing in supervising the priest, and prevent the victims of the priest from filing a civil lawsuit." He asserts that he "had no means to 'discover' that the Diocese was aware of child sex abuse allegations involving the priest by others, because this knowledge was purposefully concealed from [him]." Mr. Redwing argues that he had no basis upon which to allege negligence on the part of the Diocese until he "had information concerning the Diocese's prior knowledge of the priest's propensities." He asserts, "[n]ot only did the Plaintiff not previously know of this information, but he had no reason or opportunity to know it, nor could he otherwise have reasonably been expected to discover it." Mr. Redwing submits that the statute of limitations in this case is tolled by the doctrines of fraudulent concealment, the discovery rule, and equitable estoppel.

At the hearing of the Diocese's motion to dismiss in the trial court, Mr. Redwing relied on dicta in *Doe* for the proposition that the statute of limitations might be tolled in cases where a plaintiff could demonstrate that he had asked the Diocese for information about a priest's prior offenses and had been refused. Mr. Redwing's argument, as we perceive it, is that because he can demonstrate that a request for information would have been useless because the Diocese and the Church as a whole were engaged in a systematic concealment of abuse by priests, the tolling of the statute of limitations for 30 years is appropriate in this case.

We are not insensitive to the pain inflicted by the abuse that was perpetuated by a shocking and alarming number of Catholic priests in this State, the United States, and across the globe. Indeed, we are aware of the plethora of news articles addressing this issue, and of the statements and apologies of the Catholic Church and Pope Benedict XVI concerning these cases. However, upon review of the record, we cannot say that Mr. Redwing's action differs factually from the plaintiffs in *Doe*, --- S.W.3d ---, 2008 WL 4253628, and *C.S. v. Diocese of Nashville*, M2007-02076-COA-R3-CV, 2008 WL 4426891 (Tenn. Ct. App. Sept. 30, 2008), *perm. app. denied* (Tenn. Mar. 16, 2009).

In *Doe*, we reviewed the case law addressing the question of the tolling of the statute of limitations in cases alleging abuse by priests, and it is unnecessary to repeat that review here. As in *Doe*, it is undisputed in this case that, when he reached the age of majority, Mr. Redwing knew that he had been sexually abused by a priest of the Diocese, that he had a right of action against the priest, and that the priest was employed by the Diocese. Thus, as in *Doe*, whether Mr. Redwing had "inquiry notice" of the alleged fact that the Diocese had knowledge of the allegations of instances of sexual abuse of other children by the priest prior to the abuse of Mr. Redwing is central to whether the statute of limitations would be tolled under all three tolling theories relied on by Mr. Redwing. As in *Doe*, the alleged child abuse is the injury in this case, not the Diocese's alleged cover-up. As in *Doe*, had Mr. Redwing filed a lawsuit upon reaching the age of majority, discovery in that case would have "provided a mechanism for [him] to learn that the Diocese had been negligent." *Doe*, --- S.W.3d ---, 2008 WL 4253628, at *16. As in *Doe*, Mr. Redwing's allegation in his complaint that "[d]espite the exercise of reasonable diligence, [he] only recently learned of the Diocese's negligent conduct" is "rather cryptic." As in *Doe*, Mr. Redwing's "conclusory allegation that he exercised reasonable care and diligence is not sufficient to prevent dismissal of the complaint as time-barred if the rest of the complaint belies the allegation." *Id.* n.17.

Despite the emotionally charged nature of this case, we cannot approach this lawsuit any differently than we would allegations against employees of any secular institution. Indeed, the very exercise of the neutral tort principles upon which we may assume jurisdiction requires us to engage in the same inquiry. Notwithstanding the flood of allegations currently posited against the Catholic Church world-wide, whether the Church as a whole engaged in a systematic cover-up is not our inquiry here. As noted above, any such cover-up is not the injury upon which this lawsuit rests. The cause of action here arises from the injury of child abuse, and "'[m]ere ignorance and failure of the plaintiff to discover the existence of a cause of action is not sufficient to toll the running of the statute of limitations.'" *C.S. v. Diocese of Nashville*, 2008 WL 442689, at *3 (quoting *Vance v. Schulder*, 547 S.W.2d 927, 930 (Tenn. 1977)). Our inquiry here is whether the statute of limitations may be tolled for three decades to permit adjudication of a lawsuit wherein a plaintiff seeks damages arising from the defendant's negligent supervision of an employee who allegedly abused the plaintiff more than 30 years ago where the plaintiff knew he was abused, knew the identity of the abuser, and knew the abuser was an employee of the employer at the time he reached the age of majority. We hold that it may not.

*Holding*

Under the ecclesiastical abstention doctrine, the trial court does not have subject matter jurisdiction to adjudicate Mr. Redwing's claims arising from allegations that the Diocese negligently hired and retained Father Guthrie as a priest. The doctrine does not bar the exercise of jurisdiction over Mr. Redwing's claim of negligent supervision. However, Mr. Redwing's action against the Diocese is time-barred under the statute of limitations set-forth in Tennessee Code Annotated § 28-3-104. Accordingly, the trial court erred in denying the Diocese's motion to dismiss. In light of the foregoing, the judgment of the trial court denying the Diocese's motion to dismiss the action as barred by the statute of limitations is reversed. Cost for this appeal are taxed against the Appellee, Norman Redwing.


_____
DAVID R. FARMER, JUDGE