**Teresa DAVIS, and husband Frank Davis, Plaintiffs–Appellants,**

v.

**MODINE MANUFACTURING CO., Christopher Vestula and Mike Swee, Defendants–Appellees.**

Court of Appeals of Tennessee, Eastern Section.

Jan. 21, 1998.

Permission to Appeal Denied by Supreme Court Oct. 19, 1998.

David A. Stuart, Stuart & Van Riper, Clinton, for Appellants.

Ralph A. Morris, Wendy L. Nutt, Brittain, Sledz, Morris & Slovak, Chicago, Edward G. Phillips, Kramer, Rayson, Leake, Rodgers & Morgan, Knoxville, for Appellee, Modine Manufacturing Co.

## *OPINION*

McMURRAY, Judge.

Plaintiff, Teresa Davis, brought this sexual harassment action against Modine Manufacturing Co. and its employee, Chris Vsetula,[1] alleging unlawful sexual discrimination in violation of the Tennessee Human Rights Act, T.C.A. 4–21–101 et seq.[2] Modine moved for summary judgment upon all claims. The Motion was granted. Vsetula did not move for summary judgment and is not involved in this appeal.[3] The issue presented is whether the chancellor erred in granting Modine summary judgment. We affirm the judgment of the chancellor.

In early 1995, the plaintiff, a Modine employee of approximately 16 years, successful-

---

1. This defendant's name is misspelled "Vestula" in the complaint. The correct spelling is "Vsetula." The other named defendant, Mike Swee, was apparently never served with process and is not a party to this appeal.

2. Plaintiff's husband, Frank Davis, has a derivative claim for "depriv[ation] of his wife's services and her acts of love and affection."

3. The judgment was made final as to Modine in accordance with Rule 54.02, Tennessee Rules of Civil Procedure.

ly bid on a transfer to a different job position within Modine. As part of her training for the new position, Modine sent the plaintiff, along with five other employees including defendant Vsetula, to its McHenry, Illinois, plant for a training mission.

Plaintiff was an hourly employee at Modine's plant in Clinton, Tennessee. Vsetula was a salaried engineer who was responsible for the transfer of a new product manufacturing line from the McHenry plant to the Clinton plant. The party also included one other salaried employee. While in McHenry, the employees stayed at a local hotel at Modine's expense.

During the day, the employees were involved in training on new equipment and manufacturing processes used at the McHenry plant which were going to be implemented at the Clinton plant. On Monday night, the first night of the trip, the Clinton employees ate dinner together. They used a rental van provided by Modine for transportation. On Tuesday night, they split up and ate at two different restaurants.

The events which led to this lawsuit took place on Wednesday night, April 5, 1995. That evening, the plaintiff and three other Clinton employees traveled to a riverboat casino. Vsetula spent the evening in the hotel lounge with an employee from the McHenry plant, Mike Swee. The employees returned from the casino at around 10:30 PM, and the plaintiff retired to her hotel room. After calling her husband, she went to bed around midnight.

She was awakened shortly thereafter by a loud pounding at her door. She heard a voice which she recognized as Vsetula's, yelling for her to let them in.[4] Plaintiff testified Vsetula yelled that if she did not let them in, they would break the door down. She also stated that he said "I want to see you in your nightie." She looked through the peephole and saw Vsetula holding his hands to his head if they were horns, bellowing animal noises and charging at the door. He was obviously intoxicated, and plaintiff testified that she was terrified that he would break

the door down and attack her. Plaintiff stated that the incident lasted two or three minutes, and then Vsetula went away.

Vsetula testified that he spent the evening drinking in the hotel lounge with Swee, and watched the Chicago Bulls basketball game on television. He stated that between them, they probably drank three or four pitchers of beer and a couple of shots of schnapps. Around midnight, they decided to go up to the employees' rooms to see how they had done gambling. The first door they reached after getting off the elevator was the plaintiff's.

Vsetula stated that he knocked on the door and asked the plaintiff to open the door and talk to him about how she had done gambling. The plaintiff told him to go away and he proceeded to knock on the next hotel door, that of Richard Hawkins, another Modine employee. Hawkins did not open his door either, so they returned to the hotel lounge. Vsetula denied saying anything about the plaintiff's nightie and charging the door like a bull, though he did admit he was being loud and boisterous.

After Vsetula left her door, plaintiff called Hawkins and stated that he had just come beating on her door and that she was very scared. She stated that Hawkins responded by saying he knew, and that Vsetula was pounding on his door as they were speaking. After talking to Hawkins, plaintiff called her husband and told him what happened. Mr. Davis insisted that she return home on the next available flight. After talking to his wife, Mr. Davis called several Modine officers, told them what had happened and demanded that they send her home immediately.

The plaintiff, afraid to stay in her room alone, spent the remainder of the night in a female co-employee's room. The next morning, Modine made arrangements for her to fly back to Clinton, accompanied by Richard Hawkins, thus leaving the training mission several days early.

---

4. Mike Swee accompanied Vsetula up to the rooms. The plaintiff testified that she heard Vsetula talking to someone else, but that she neither heard nor saw the other person from inside her room.

Modine initiated an investigation of the incident upon the plaintiff's arrival back in Clinton. Plaintiff was met at the airport by the Clinton plant superintendent, the engineering manager who was Vsetula's supervisor, and the plant human resources manager. Statements of all the employees who traveled on the training mission were taken. Mr. and Mrs. Davis met with the plant officials the afternoon of plaintiff's arrival. At that meeting, Mr. Davis demanded that his wife be given a week off with pay, and the plant officials complied.

The plaintiff testified that she continued to be upset and nervous about the incident, and could not get it off her mind. She eventually sought psychological counseling from Dr. Deborah Dennis, a licensed clinical psychologist. Dr. Dennis diagnosed the plaintiff as suffering from post-traumatic stress disorder and a depressive disorder, in addition to agoraphobia ("abnormal fear of crossing or of being in the midst of open or public places")[5] and claustrophobia ("abnormal dread of being in closed or narrow places") which she opined was caused by the incident. Dr. Dennis recommended that the plaintiff be put on a medical leave of absence from work.

It appears that after the plaintiff's week off with pay, she took some vacation time. She came back to work on Monday, May 1, 1995 and worked a half day on May 2. From May 2, 1995, the date of Dr. Dennis' letter recommending a medical leave, until July 31, 1995 the plaintiff was placed on a medical leave of absence from work. On August 10, 1995, she gave notice that she was quitting her job with Modine effective August 11, 1995. On the notice, for "specific reason" she wrote "found another job." She testified in her deposition that the reason she left Modine was that she found other employment.

The plaintiff testified that when she returned to work at the Clinton plant, several co-workers told her about various rumors regarding her and the McHenry trip. In her affidavit, plaintiff states:

I learned that various rumors regarding what had happened in McHenry were cir-

culating at work. One rumor was that I had been raped by Mr. Vsetula. Another rumor was that I had been caught in bed with Richard Hawkins. Another rumor was that I had bought sexy lingerie especially for the trip and that I deserved what had happened because I was nothing but a flirt. Plant managers told me that they believed me about what had happened in McHenry, and I asked my employer to take steps to inform the work force of what had happened, and to put a stop to the rumors, but my employer refused to do so.

On June 14, 1995, before she returned to work, plaintiff filed suit in Anderson County Chancery Court, alleging sexual harassment and discrimination against Modine and Vsetula. She also alleged Vsetula was guilty of outrageous conduct and assault, and that Modine was vicariously liable for Vsetula's actions under *respondeat superior*. The chancellor found that even assuming all of plaintiff's assertions to be true, she failed to state a cause of action against Modine, and consequently granted the company summary judgment.

We now turn to the question of whether the chancellor properly granted summary judgment under the Tennessee Human Rights Act (THRA). Our Supreme Court has stated that an analysis of a plaintiff's claim under the THRA is identical to that under the Title VII of the Federal Civil Rights Act. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn.1996). Therefore, our courts have turned to federal Title VII cases for guidance in sexual harassment cases. *See Spicer v. Beaman Bottling Co.*, 937 S.W.2d 884, 888 (Tenn.1996). The *Campbell* court noted that "it is beyond dispute that both the Federal and State acts apply to claims of discrimination based on the existence of a hostile work environment," *Id.*, such as the claim at bar.

■ The *Campbell* court set forth the following analysis:

To prevail on a hostile work environment claim in a sexual harassment case, an employee must assert and prove that (1)

5. Webster's Third New International Dictionary (1993).

the employee is a member of a protected class; (2) the employee was subjected to unwelcomed sexual harassment; (3) the harassment occurred because of the employee's gender; (4) the harassment affected a "term, condition, or privilege" of employment; and (5) the employer knew, or should have known of the harassment and failed to respond with prompt and appropriate corrective action.

\* \* \*

[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.

\* \* \*

In determining whether an environment is hostile or abusive, a court must consider the totality of the circumstances. While no single factor is required or conclusive, considerations relevant to the determination include, but are not limited to, the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance; and the employee's psychological well-being.

*Campbell,* 919 S.W.2d at 31–32 (citations omitted).

■ In this case, the April 5, 1995, McHenry incident is the sole occurrence of alleged harassment about which plaintiff complains. Under these circumstances, accepting all of plaintiffs' testimony as true, we do not think this solitary incident was sufficient to create an objectively hostile or abusive work environment. We consider it significant that during the whole two to three minute incident, a locked hotel door remained between the plaintiff and Vsetula. In addition, while the employees were admittedly in McHenry for a work training mission, the incident occurred after the employees had been off-duty for many hours, and away from company premises.

The plaintiffs correctly point out that a single incident, if sufficiently severe, "may be actionable as sexual harassment despite the fact that the conduct was not repeated." *McClellan v. Board of Regents of State University,* 921 S.W.2d 684, 692 (Tenn.1996). In the *McClellan* case, however, the defendant's conduct was significantly more severe than in the present case.

The *McClellan* defendant, a university professor, entered a room notwithstanding that he had been told that the plaintiff was not wearing a shirt, forcibly removed the shirt that the plaintiff was covering herself with, and made a derisive comment about her breasts. *Id.* at 686. The *McClellan* court specifically noted that the defendant was allegedly guilty of "inappropriate physical conduct, including physical contact as well." *Id.* at 692.

While we do not suggest a hostile work environment claim based on sexual harassment hinges on physical contact, we note that in this case, the defendant neither saw nor touched the plaintiff, who remained behind a locked door. In summary, while we find Vsetula's action to be irresponsible and thoughtless conduct for which he may ultimately be found personally liable, it is insufficient, standing alone, to create an objectively hostile and abusive work environment for which his employer is liable.

■ We further find that the plaintiff has failed to demonstrate that Modine "failed to respond with prompt and appropriate corrective action." Modine instituted an immediate and thorough investigation of the incident as soon as it received notice. Company officials interviewed and took statements from all of the parties involved. After several meetings with Vsetula, Modine suspended him for two weeks, forcing him to take his yearly vacation time over that period. Modine officials told Vsetula that if such an incident ever happened again he would be immediately fired, and the notes regarding the incident were placed in his permanent employee personnel file.

In addition, Modine acceded to Mr. Davis' demands that his wife be sent home immediately after the incident, and that she be given

a week off with pay. The company allowed her to take a medical leave of nearly three months. On May 2, Modine set up a meeting at the plant where Vsetula apologized to the plaintiff and her husband, indicating that he did not intend to harm or scare her.

The plaintiff complains about the presence of rumors circulating among her co-workers at the plant, and states that they contributed to a hostile work environment. She testified that she requested company officials to gather all her co-workers together in a meeting and explain what happened at McHenry, an action she argues would have ended the rumors. Modine declined this request, stating that company policy was to keep in strict confidentiality its decisions regarding discipline of its workers. Pursuant to this policy, Modine officials did not want to announce its punishment of Vsetula to the entire plant.

Regarding an employer's duty to take corrective action, the *Campbell* court stated:

Title VII does not impose strict liability for hostile environment claims. Even if an employee establishes the existence of a hostile work environment, the plaintiff will not recover under Title VII unless the proof demonstrates that the employer either knew or should have known of the harassment, *and* failed to take prompt and appropriate remedial action ...

Title VII does not precisely define "prompt and appropriate remedial action;" however, in general, employers are required to take steps "reasonably calculated" to terminate the harassment.... Of course, what remedial action is reasonable and appropriate will vary depending on the circumstances of each case.

*Campbell,* 919 S.W.2d at 32–33 [emphasis in original; citations omitted].

We are of the opinion that, under the circumstances of this case, a trier of fact could only reasonably conclude that Modine took prompt and appropriate corrective action, reasonably calculated to terminate the alleged harassment. The THRA's purpose, among other things, is "to prohibit discrimination in employment" and not to restrict the employer's right to make legitimate business decisions. *Bruce v. Western Auto Supply Co.,* 669 S.W.2d 95, 97 (Tenn.App.1984). We think Modine's decision not to call a plant meeting to discuss what had happened in McHenry was such a reasonable and legitimate business decision.

In a meeting between Vsetula, his supervisor, the plant human resources manager and the plant superintendent, the Modine officers apparently attempted to make sure Vsetula understood the seriousness of his conduct. The human resources manager made notes of the meeting in the form of an internal memorandum which stated:

... All the facts point to one issue, harassment or possibly sexual harassment.

Gerald commented that from Chris['s] perspective this is a much different issue than from Teresa['s] perspective. This has a much higher level of importance to Teresa. In addition, when you are out of the plant representing Modine, you have to consider the perception of your actions Vs what is received. All of your actions can put Modine in jeopardy.

Gerald add[ed] that I think you made some bad judgment, going out and getting drunk is not in the best interest of anybody, particularly when you are in a supervisory roll [sic]. We must prevent this from ever happening again. I'm not sure you realize who [sic] serious this could have been, you and Modine both could have been sued and still could be sued ...

Plaintiffs argue that the above statements, particularly the one referring to "a supervisory rol[e]," are party-opponent admissions and raise a question of fact as to whether Modine should be held vicariously liable for Vsetula's actions that night. It has long been a well-established rule that for an employer to be held vicariously liable, through the *respondeat superior* doctrine, for an employee's actions, the plaintiff must prove that the employee was acting within the course and scope of his employment when the injury occurred. *Hamrick v. Spring City Motor Co.,* 708 S.W.2d 383, 386 (Tenn.1986); *Tennessee Farmers Mut. Ins. Co. v. American Mut. Liability Ins. Co.,* 840 S.W.2d 933, 937 (Tenn.App.1992).

Ordinarily the question of whether an employee is acting within the course and scope of his employment is one of fact for the jury; however, where the departure from the employer's business is of such a "marked and decided character" that reasonable minds could reach but one conclusion under the undisputed facts, summary judgment is proper. *Craig v. Gentry,* 792 S.W.2d 77, 80 (Tenn.App.1990); *Home Stores, Inc. v. Parker,* 179 Tenn. 372, 166 S.W.2d 619, 622 (Tenn.1942); *Tennessee Farmers,* 840 S.W.2d at 936–7.

In this case, a reasonable person could not conclude Vsetula was acting in the course and scope of his employment. The incident occurred past midnight, off company premises, and after Vsetula had been drinking on his own time and money for many hours. The plaintiff recognized that "it was after work time" and the employees were free to spend their time as they chose. Modine cannot be held liable under a *respondeat superior* theory in this case.

The plaintiffs also complains of the award of discretionary costs adjudged against them. They candidly recognize, however, that the award of discretionary costs is discretionary with the trial court, citing *Lock v. National Union Fire Ins. Co.,* 809 S.W.2d 483 (Tenn. 1991) and *Oster, Div. of Sunbeam Corp. v. Yates,* 845 S.W.2d 215 (Tenn.1992). They ask for relief only if this case is reversed and remanded to the trial court. We find the plaintiffs' candor to be commendable. The plaintiff states "plaintiffs have included this issue on appeal for the purpose of requesting this court to reverse the award of discretionary costs if it remands any or all of the plaintiffs' claims for trial." Our disposition of the issue relating to the motion for summary judgment, therefore, renders the issue moot.

The judgment of the trial court is affirmed in its entirety and the case remanded for such further action as may be necessary. Costs on appeal are assessed to the appellants.

GODDARD, P.J., and FRANKS, J., concur.