IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 16, 2016 Session

**HENRY FLETCHER v. CFRA, LLC**

**Appeal from the Circuit Court for Davidson County**
**No. 14C1630     Hamilton V. Gayden, Jr., Judge**

_____

**No. M2016-01202-COA-R3-CV**

_____

Henry Fletcher ("Plaintiff") sued CFRA, LLC ("CFRA"), which owns and operates an International House of Pancakes ("IHOP") restaurant in Antioch, Tennessee, alleging that CFRA was liable for the actions of its IHOP employee, Kenneth W. Hale, Jr. ("Hale"), in connection with an assault upon Plaintiff committed by Hale. The Circuit Court for Davidson County ("the Trial Court") granted summary judgment to CFRA. Plaintiff appeals the grant of summary judgment. We find and hold that CFRA made a properly supported motion for summary judgment, that Plaintiff failed to show that there are genuine disputed issues of material fact that would preclude summary judgment, and that CFRA was entitled to summary judgment as a matter of law. We, therefore, affirm the grant of summary judgment to CFRA.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and BRANDON O. GIBSON, J., joined.

David J. Weissman and Benjamin K. Raybin, Nashville, Tennessee, for the appellant, Henry Fletcher.

Mark S. LeVan and Christopher M. Jones, Nashville, Tennessee, and Charles T. Hvass, Minneapolis, Minnesota, for the appellee, CFRA, LLC.

# OPINION

## Background

Hale had been hired as a dishwasher working third-shift at the IHOP. When Hale was hired by IHOP and at the time of the assault upon Plaintiff, Hale was on parole for aggravated battery and felony firearm convictions.

The assault giving rise to this suit ("the Assault") occurred on May 12, 2013. At approximately 6:30 a.m. on that day, Plaintiff and a friend, DeAries Holland ("Holland"), were customers at IHOP. When Plaintiff and Holland left IHOP, there was a dispute about whether their bill had been paid. Hale and a waitress approached Plaintiff and Holland in the IHOP parking lot, and the issue regarding the bill was resolved. Plaintiff and Holland then left the IHOP parking lot. Hale, who had clocked out after finishing his shift, was picked up by his girlfriend, and they also left the IHOP parking lot. Hale and his girlfriend and Plaintiff and Holland drove to a nearby apartment complex where the Assault occurred.

Plaintiff sued CFRA alleging that it was vicariously liable for Hale's actions and that it also was directly liable for negligent premises security and for negligently hiring and supervising Hale. CFRA filed a motion for summary judgment supported by, among other things, the deposition testimony of Hale, Hale's girlfriend, Plaintiff, and two IHOP employees.

Hale's girlfriend, Sandi F. Cox, testified that she and Hale were living together in the Saxony Apartments at the time of the Assault. Cox testified that Hale had started working at the IHOP approximately a month prior to the Assault. Hale had interviewed for a job as a waiter, but he was not hired as a waiter due to his criminal background. Instead, Hale was hired as a dishwasher working third-shift.

Cox testified that Hale called her on the day of the Assault to tell her that he was finished working, and she could pick him up. Cox stated that after that initial telephone conversation, she called Hale back and asked him to get her some orange juice because she was feeling unwell. During that second telephone call, Hale told Cox about a verbal confrontation he had with Plaintiff and Holland in the IHOP parking lot. She stated that Hale told her that "two guys tried to skip out on their bill," that he had gone out to the parking lot with a waitress to get them to pay, and that "they threatened to shoot him." Cox further stated:

> Well, he told me that he was very calm about it, he didn't get upset with the
> threat. And I told him I was proud of that, I was proud of him for that.

2

Because when someone makes threats to you, that can normally trigger anger, and so I was proud of him keeping his cool. But that was basically it.

Cox testified that when she pulled into the IHOP parking lot, Hale was inside the IHOP. Cox was driving a red Chevy Aveo, and she had her four-year old son in the car with her. Cox noticed a yellow Dodge Charger in the IHOP parking lot. When Hale got into Cox's car, Cox mentioned the yellow Dodge Charger because she "really like[d] those cars." Hale told Cox that the people in the yellow Dodge Charger were the ones who had threatened him.

The yellow Dodge Charger pulled out of the IHOP parking lot before Cox pulled her car out of the lot. Cox was driving, and Hale was in the passenger seat. Cox stated that she noticed as she was driving that the yellow Dodge Charger was behind her car. She stated:

> We both - - well, we both began to panic because we know they left before us. And he had previously threatened - - well, the people in the car had previously threatened [Hale]. And they threatened to shoot him, and so we were both panicking because we didn't know if the threat was credible or not. And so he didn't want us to drive home because he didn't want us to go exactly where we live and they know where we live, so he told me to turn going toward Chimney Top Apartments because he had a friend that lived there.

Cox testified that her ex-husband also lived at the Chimney Top Apartments ("Chimney Top").

Chimney Top is a gated community, and Cox had to enter a code to get through the gate. Cox explained that she knew the Chimney Top emergency code because she previously had lived at Chimney Top. Cox input the code and pulled through the gate. The yellow Dodge Charger pulled through the gate right behind her. Cox drove toward the back of the apartment complex toward where Hale's friend lived. The yellow Dodge Charger followed. Cox pulled into a parking spot, and Hale got out of the car. Hale told Cox to leave and take her son home. Cox did so and did not stay to see what happened.

Cox stated that before she left Chimney Top she saw two people get out of the yellow Dodge Charger, one through the driver's door and one through the passenger's door. Hale started walking toward his friend's apartment. Cox stated that Hale was walking away and "it looked as if [the people from the yellow Dodge Charger] were proceeding towards him."

Cox went home. She stated that Hale telephoned her as she was arriving home and asked her to pick him up "on the road past Summit, which is the apartment complex right next to Chimney Top." She picked Hale up, and they went home. When they got home, Hale told Cox: "That they got into it. He fought with them, and that he hit them - - hit one of them." Hale then telephoned Cox's mother, his mother, and the police.

Cox was shown a video taken at the IHOP, and she stated that it showed the yellow Dodge Charger leaving the IHOP. She stated: "He makes it to the bottom of the hill, and it looks as if he is backing into this - - it's a little cut area, it's not an actual road." She stated that the video then showed her car passing the yellow Dodge Charger and the yellow Dodge Charger pulling out and following her car.

Kara March ("March"), the waitress who accompanied Hale out to the IHOP parking lot, testified that she was working at IHOP as a server, but she was not the person who served Plaintiff and Holland on the date of the Assault. On the date of the Assault, March had just finished cleaning a table "or something" and:

> [Hale] came out and he was like, "Are you guys going to let them walk out?" And I had said, "Who?" And he said, "The table back here." At the time, he's walking, so I follow him shortly behind. And I believe we have - - we've seen pictures of that." . . . He continues to walk, to follow the guys outside of the - - outside of the store, outside of the restaurant. . . .

March followed Hale. She stated: "My point of following him was to get these guys to pay. That was my only focus was to get the guys to pay their ticket." March admitted that Hale was a dishwasher and not a manager, and she was not following what she understood to be the policy about walkouts when she followed Hale. March never had worked with Hale before that day and did not know that he had a criminal record.

March stated that she and Hale approached the yellow Dodge Charger, and Hale opened the driver's-side door. The driver was inside the car, but the passenger was not yet inside the car. March stated:

> And then when he opened the door, the driver got out and said, "Don't touch my car." And then the passenger come around to the front and asked me how much the ticket was. I said, "I will run in and find out."
>
> I ran back into the restaurant. Went to the register. Looked the ticket up on the computer. Got the total. Went back out. Told the passenger the total.

4

He's standing at the front of the car now. He hands me a 20 and a 10, I believe. He handed me $30 total. I come back, and he tells me, "Leave the rest for the server." I said, "Okay."

I then come back inside and cash out the ticket. And I believe Mr. Hale is close behind me, but I'm not sure. . . . As I walk in and cash out the ticket, then the passenger comes in after that and he takes the rest of the money. I don't know what he does with that. I'm guessing he gives it to his server. And then I go back to work, and it's a regular day after that for me.

March stated that the only statement she heard from Holland was: "Don't touch my car."

March testified that she never has seen an IHOP written policy with regard to walkouts. She stated that there is an IHOP employee handbook, and she was given a copy of the employee handbook when she was hired. March was asked what sorts of things were in the employee handbook, and she stated: "I would say your duties, your responsibilities, how you're supposed to dress, your uniform, how you're supposed to wear your hair, the proper way to wash your hands." March was asked if there was a policy with regard to walkouts in the handbook, and she stated: "I'm sure there is in there. I'm not familiar with it because - - as in the book, I'm not familiar with it." March testified that her understanding about the policy with regard to walkouts was that a manager would go out after the customers along with an employee to act as a witness. March stated that she did that on one occasion with a manager, but those customers had already left the parking area.

Plaintiff was asked if he ever had been to that IHOP prior to the Assault, and he stated: "Yes. Made several trips there. Literally almost weekly." Prior to the day of the Assault, however, Plaintiff never had met Hale. Plaintiff did not believe that Holland ever had met Hale prior to the Assault either. Holland died before Plaintiff was deposed.

On the date of the Assault, Plaintiff had been drinking but was not driving. He stated that when he and Holland arrived at the IHOP: "I was severely buzzed. I wasn't intoxicated not to be able to handle myself. . . . Because I was still able to function - - walk, talk, mingle - - but I had drinks in my system." He testified that Holland was the driver and that Holland had not been drinking. Plaintiff was asked if he ate anything at the IHOP, and he stated: "Yes. And I know specifically my tab came up to 21.84. . . . I paid for both of us. The meal was 9.99 apiece." Plaintiff was asked if he would have remembered what happened at the IHOP if he had not seen the video, and he stated: "The money? No. I already knew that I paid. I stated that several times. As far as specifically

how it went down, no, I wouldn't have recalled specifically, but I said that several times, that the money was on the table."

Plaintiff testified that from memory he thought the first time Hale spoke to them was inside the IHOP, but on the video it appears to be outside. He stated: "But I just know we had a confrontation right there towards the door." Plaintiff does not remember any details about the confrontation. Plaintiff does not remember any of the conversations with Hale, and does not know if Hale physically touched him or Holland at the IHOP.

Plaintiff could not recall if Holland's car followed the car Hale was in, but he stated: "No, but per statement, we were actually followed. And I also seen the video - - I see that on the video we was also followed." When asked what he meant by per statement, Plaintiff stated: "I don't remember, but documentation, police reports, so forth and so on, states that we were followed, and also the video shows that we were followed." Plaintiff never has seen any statements made by Holland, Hale, or any employee of IHOP.

Plaintiff could not recall stopping after he and Holland left the IHOP. He admitted that he does not even recall leaving the IHOP parking lot. Plaintiff admitted that he has no recollection about being followed by the car Hale was in, and that he was just testifying as to "what [he] saw in the video and was written in the statements, correct." Plaintiff stated that he remembers being at the IHOP, but stated: "My memory stops from when I paid my money. When I knew that it was paid and I got ready to leave. But other than that, anything after that, I do not remember." Plaintiff was asked if his last memory was of being at the IHOP and getting his money off of the table, and he stated: "Correct." Plaintiff stated that his next memory was from: "Four days later, when [he] woke up from the coma [at Vanderbilt University Medical Center]."

Plaintiff was asked if he was testifying that he left money on the table, and he stated: "That's 100 percent correct. . . . It's 21.84. I left two twenties." Plaintiff was asked if he remembered anything that happened in the IHOP parking lot, and he stated: "I remember the conversation about the tab. And I said, "I've already paid, the money is on the table", so forth and so on. And then that's when I remember - - I didn't even know [Holland] gave them money again until after, you know, the conversation, and I went back in there to get my money." Plaintiff then stated that he was in the car before the conversation with Hale occurred. Plaintiff could not remember if Holland was already in the car at that point or not. He also could not remember if Hale touched Holland's car.

Plaintiff was asked why there was confusion about whether he and Holland had paid their bill, and he stated:

6

Every time you go to IHOP, you're supposed to pay at the door. . . . It was a lack of not paying attention on our behalf that we left the money - - that I left the money on the table. . . . So I'm very well aware that you're supposed to pay at the door. I've went there several times, to know that. It's just partying, having fun, boom, forgot.

When asked again if he had any memory of whether Holland's car followed the car Hale was in or if it was the other way around, Plaintiff stated:

Well, I can answer that in another way. . . . If we're heading out first, and this is a one way street, the only way - - we were in front of him. He couldn't go around us. It's not like the streets are double. So the only way we could have followed him is if when we got to the end, we made a right and turned around. Which the only way you still can make a right - - you still have to go to the light and come back around. They would have been gone by then. So that there, it's obvious that they had to follow us. . . . No [there's no place to pull over and wait for them]. The reason why it's not a place to pull over right there is because it's a - - what do you call that? A car lot. That is Carnival Kia - - well, it was Carnival Kia at that point in time. And they had cars right there. So I don't know how we would have pulled over there when there's cars for sale right on the side of the road.

Plaintiff was asked if he and Holland would have pulled over, waited for Hale to pass, and then pulled out after Hale, and Plaintiff stated: "Not for any reason that I would have thought of. Not that I can say that that's not what happened, but not for any reason I would have thought of."

Plaintiff testified that he never has lived at Chimney Top. Plaintiff stated that when he and Holland left the IHOP they "were actually going to some friends' house, a couple of female friends, to party, to have fun, and we'd go home, and that was the plan." Plaintiff could not remember the names of these friends and when asked if he knew where the friends lived he replied: "I don't. Chimney Top, from my understanding. It was his female friends. One of his friends who had a friend with her." Plaintiff did not know when the arrangements had been made to go see these friends. Plaintiff was asked if Holland had had a telephone conversation with these friends, and Plaintiff stated: "That's where we was going over to one of his female friends' house. Which [Holland] had a lot of females. That was just him. . . . I was a tag along buddy at that point in time." When asked again if he knew which building or apartment the friends lived in, Plaintiff stated: "Huh-uh (negative). Because he's that type of detail person. Like, 'Man, just shut up and let's go.' That's the type of person [Holland] was."

7

Plaintiff was asked if he had spoken with Holland about what happened that night, and he stated:

> Actually, when the situation happened, I was real upset with it happening, and so I distanced myself from him. . . . He went to the grave without me speaking to him. And it kind of really bothered me about it, because I was upset with the stories that were going around, saying that he ran and left me because he was scared of the guy. But, you know, I never really got his side of the story. I took what was being told to me and I didn't want to deal with it no more. So I never had a conversation with him.

Hale testified that he never met Plaintiff or Holland until the day of the Assault. Hale clocked out from his shift at IHOP at 6:34 a.m. Plaintiff and Holland left the IHOP at 6:34 a.m. Hale thinks he was already outside when Plaintiff "got up to go out there." Hale stated that he passed Holland going out as Hale was coming in. Hale was asked why he had been outside, and he stated: "I was outside smoking. And on my way back in [Plaintiff] told me to tell Holland to pay for the meal." Hale testified that Plaintiff "said hey, make sure my home boy pay for the meal." Hale testified that when he passed Holland, he told Holland what Plaintiff had said and kept walking. Hale stated: "I didn't wait for any response or anything. I just said your home boy said you got to pay for that meal and I kept walking." Hale looked back and saw Holland leave without paying. Hale was told that Plaintiff claimed to have left money on the table and Hale stated: "No, sir."

Hale stated that he and a waitress went outside. Hale was on the driver's side of Holland's car. Hale walked up and knocked on the driver's side window. Hale stated that Holland opened the door "and threatens me and said I could have shot your big ass walking up on my car like that." Hale testified that Holland said these words with a threatening tone. Hale stated that he replied: "It sound good. For twenty-three dollars and some change? You are going to kill me over twenty-three dollars and some change?" Hale could not remember Holland's response. Hale testified that Holland made Plaintiff go back inside to pay. Hale stated that the waitress went back inside, then Hale went back inside, and then Plaintiff went back inside. Hale went back to the drink station to get an orange juice. Plaintiff headed back to where he and Holland had been sitting. Plaintiff then left the restaurant. Hale headed toward the lobby, but turned around. He could not remember why he turned around.

Hale testified that there was no physical contact between Hale and Plaintiff, or Hale and Holland at the IHOP. Hale stated that after Plaintiff had paid the bill and exited the IHOP, Hale did not think anything else was going to happen. Hale then headed out the door to meet his girlfriend who was waiting in the parking lot. Hale stated that Cox

had her four year old son in the car with her. Hale stated that when he got into Cox's car, Holland pulled up and "[Holland] got to talking more smack. But I can't really recall what he said. But I know he was making gestures and stuff. And then I knew that my girl, her son was with me, so I didn't say anything. Now, it's like real serious." Hale stated that he did not respond to Holland.

Holland pulled his car around the back of the IHOP and all the way around and out on to the street. Cox then backed her car up and pulled out of the IHOP parking lot. Hale stated that when they got to the end of the street, he saw the yellow Dodge Charger, which was on the passenger side of Cox's car. The yellow Dodge Charger was parked. Cox drove past the yellow Dodge Charger. The yellow Dodge Charger then pulled out and followed Cox's car. Hale explained that they had passed the Kia dealership and that the yellow Dodge Charger had been parked near the Steak n'Shake.

Hale noticed the yellow Dodge Charger following them, and he said to Cox: "these guys are following us, let's go to Chimney Top. Because that's where her brother was. And I had another friend that lived up there." Hale decided to go to Chimney Top: "Because I knew these guys was wanting some trouble. They was following us. You know what I'm saying? So I decided to go that way where I had some help - - . . . if I needed it." Hale stated that he couldn't be sure that they would follow, "[b]ut you know what I'm saying? You just had threatening words with these guys, so I'm assuming they would follow me, so that's why I wanted to detour this way." Hale was asked why he didn't just call the police, and he stated: "Because at that time in my life I was a dumbass. I thought I could handle stuff myself." Hale was asked how he got the code for the Chimney Top gate, and he stated: "Because my friend lives there and he had the code. It's like, you can go ahead and punch it in and come on down, whenever, you know, that I come to visit."

Between the time they left the IHOP and the time they arrived at Chimney Top, Hale had called his friend and "said I think these guys are following us. I think there's going to be some trouble. Put your shoes on and come outside." Hale stated that he tried to telephone Cox's brother, but could not reach him. Hale told Cox to park, and he saw his friend, so he got out of the car and began walking toward his friend.

Hale stated: "As I was getting out of the car, like you know, with my leg out of the car, Holland is trying to call me to his car. And I tell him hell no. And that's when I really take off." Holland got out of his car and ran up behind Hale. Hale stated:

So I run down into the parking lot. Because at first I was on the sidewalk.
So I run down actually into the street. And he chases me into the street.
And then that's when I get away from him. And as I was turning around to

9

go back towards [Cox's] car [Plaintiff] gets out of the car and acts like he has a gun that he is hiding underneath his shirt.

Plaintiff did not pull a gun, and Hale approached him and hit Plaintiff in the face. Plaintiff fell to the ground. Hale stated that Holland was running behind Hale.

Hale ran "straight to their car." When asked why he ran to their car, Hale stated: "Because I was going to get away." Hale got into the yellow Dodge Charger, put it in gear, drove forward, and hit Plaintiff. Hale stated that he was not intending to hit Plaintiff, but he also was not intending to avoid hitting Plaintiff. Hale was asked where Holland was at that point in time, and he stated: "I think he was paused in shock. I don't know. Like he wasn't chasing me anymore once I ran him over. He was stuck for a minute, I guess." Hale stated:

When I go straight - - the parking lot - - normally where I'm at it's a circle, but that day they had built a pipe so that - - I guess it was a pipe - - or whatever. So I had - - I was fixing to leave, but it was dug, so I had to turn around - - . . . and that's when Holland ran up on the car and got to attacking me through the window.

Holland was trying to grab him, and Hale "sped up on the gas." He stated: "I slammed on the gas." Hale then hit Plaintiff again. Holland was running behind the yellow Dodge Charger at that point. Hale drove away from Chimney Top. He pulled into another nearby apartment complex, parked and locked the car, and telephoned Cox to come get him. He and Cox went home where Hale telephoned Cox's mother, his mother, and the police. Hale was sentenced to "Eight years or 30 percent" in connection with the Assault.

Christina McNamara ("McNamara") was the IHOP manager who hired Hale. McNamara testified that initially she was skeptical about Hale's background. She explained:

That he had a felony on his record. And when I say that, because he was forthcoming about it, I felt more at ease about it, about hiring him. Most people who know that a company like ours didn't really do background checks for associates would not even put it on there to begin with. And he was very open and honest about what he had listed as his felony on the application.

When asked what type of felony Hale had listed on his application, McNamara stated: "I think it had something to do with a firearm and battery, maybe. . . . Or assault of some

sort." McNamara testified that she did not do background checks for hourly associates and, indeed, was not permitted to do them.

With regard to the Assault, McNamara stated:

I had seen [Hale] as he was clocking out. He was finishing up. He was clocking out. He had told me good-bye. I believe I went on with my duties elsewhere after that.

Next thing I heard was somebody saying - - I believe somebody was saying that somebody was trying to walk out on their ticket. And then I saw [Hale] out there at the car. So in my head I thought, "Oh, he knows this guy, you know."

Apparently, that wasn't the case. He came back in. The guy paid his ticket. [Hale] left. That's all I assumed that the situation had ended up to be.

I don't even recall saying anything to [Hale] about it, because, under my assumption, he was just out there talking to a guy he knew.

And then I get a phone call from somebody - - I don't remember; it was one of the employees who had already left for the day - - saying that an incident had just occurred with [Hale] and the guy who had walked out on his particular - - or allegedly walked out on his ticket. And that's when we had learned of the situation.

Thomas E. Gough "(Gough")", the Chief Financial Officer for CFRA testified that CFRA stands for Carolina Family Restaurant Associates. He explained that CFRA operates over 40 IHOP locations, and that all of the hiring is done by CFRA, all of the management is done by CFRA, and all of the operations are governed by CFRA. Gough testified that CFRA created a written policy with regard to walkouts after the date of the Assault. At the time of the Assault there was a verbal policy with regard to walkouts. Gough stated that the verbal policy was:

We don't want our employees going out into the parking lot after customers. All of our policies - - we have a back door policy, kind of the same thing, that no one's in the dark - - and it's mostly driven by the dark. But, like, taking out the trash, any type of incident where we've got our employees going in the parking lot, we don't want that taking place at nighttime.

11

Then again, as far as dining and dashing, you know, typically it's happening usually at night, more often than not. So the policy is for - - not to leave the building.

Gough testified that there is a government program, Work Opportunity Tax Credit, that provides incentives for employers to hire certain targeted individuals such as ex-convicts in order to receive a tax credit. Gough stated: "While the government's had the program out there, we've always taken advantage of it." He stated that the program has been in place for ten or twelve years and was in place at the time of the Assault.

Gough testified that at the time of the Assault, CFRA only did background checks for management employees due to factors of cost and time because there is a high turnover in regular employees in the restaurant industry.

On May 25, 2016, the Trial Court entered its order granting summary judgment to CFRA after finding and holding, *inter alia*:

Mr. Hale was employed as a dishwasher at an IHOP location, owned by CFRA, LLC. At approximately 5:30 am on May 12, 2013, Plaintiff and his friend, Mr. Holland, entered the restaurant and occupied a booth for an hour. Plaintiff was intoxicated, and both he and Mr. Holland had been drinking the night before. Mr. Hale clocked out of his shift at 6:34 am and stepped outside the restaurant to wait for his ride. Plaintiff and Mr. Holland finished their meal and left money at the table, in lieu of paying at the front cash register as was the custom practice [sic]. Mr. Hale observed Plaintiff and Mr. Holland as they left the restaurant, and became concerned as to whether they did or did not pay for their meal. Mr. Hale and a waitress went out to the parking lot and confronted Plaintiff. Plaintiff gave them money for the bill, then went inside to retrieve the money that he had left on the table. Although words were exchanged, no physical altercation ensued at that time. Mr. Hale's girlfriend picked him up at the restaurant and together, they drove to Chimney Top Apartments. There is a dispute as to whether video surveillance shows that they were followed by Plaintiff and Mr. Holland. Nevertheless, once Mr. Hale exited his car at the apartment complex, a physical confrontation ensued. Mr. Hale allegedly exchanged blows with Plaintiff and Mr. Holland, and ran over Plaintiff in his car. Plaintiff now contends that CFRA, LLC, [sic] is liable for any harm caused by Mr. Hale's actions.

* * *

In regards to any altercation that occurred on IHOP's premises, Plaintiff does not dispute that Mr. Hale had no authority to intervene when Plaintiff left the restaurant. Plaintiff has offered no evidence to suggest that Mr. Hale's actions were required by his position, job title, job description, or that Defendant has otherwise instructed him to intervene on behalf of his employer. Rather, the record states that the alleged assault occurred at Chimney Top Apartments, nearly one mile away from any property owned by CFRA, LLC. Given the location of the incident, the nature of Mr. Hale's job, and the fact that Mr. Hale had completed his shift before the alleged harm occurred, it is impossible for a reasonable jury to conclude that Mr. Hale's actions could have been "reasonably foreseen" or otherwise prevented by the defendant.

Video footage shows Mr. Hale being pursued by the Plaintiff after the initial encounter, and it follows that his off-site response to Plaintiff's pursuit was motivated by a purpose outside the scope of his employment. At the time that the harm occurred, Mr. Hale was "obeying his own will, not as a servant or agent, but as an independent person." Due to the fact that Mr. Hale was not fulfilling some purpose of the defendant, and due to the unrelated location of the harm, this Court finds that the agency relationship was, at least temporarily, suspended.

Plaintiff further contends that Defendant breached its duty of care. The applicable law states that a duty can be imposed on a business to take reasonable measures to protect its customers from foreseeable criminal acts that occur *on its premises*. However, this duty does not extend to unforeseeable crimes that occur off premises. The video shows a verbal confrontation in the parking lot of the IHOP location, but the alleged assault occurred in a separate location, on private property over which Defendant had no control.

\* \* \*

The evidence in this case clearly demonstrates that any criminal act occurred outside of the immediate vicinity of Defendant's premises, and would not have been "reasonably foreseeable" to the Defendant. The plaintiff has not offered proof to suggest that the employee was acting within the course and scope of his employment when the injury occurred. Thus, based on its review of the record, this Court finds that "there is no

13

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."

(citations omitted). Plaintiff appeals the May 25, 2016 order to this Court.

## **Discussion**

Although not stated exactly as such, Plaintiff raises two issues on appeal: 1) whether the Trial Court erred in granting summary judgment to CFRA on the claim for vicarious liability; and, 2) whether the Trial Court erred in granting summary judgment to CFRA on the claim for direct liability.

As our Supreme Court has instructed:

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *see also Abshure v. Methodist Healthcare–Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010). In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013) (citing *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 471 (Tenn. 2012)).

\* \* \*

[I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a

14

separate, numbered paragraph and supported by a specific citation to the record." *Id*. When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S. Ct. 1348. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye v. Women's Care Cntr. of Memphis, MPLLC*, 477 S.W.3d 235, 250, 264-65 (Tenn. 2015).

We first consider whether the Trial Court erred in granting summary judgment to CFRA on the claim for vicarious liability. As this Court has explained:

It has long been a well-established rule that for an employer to be held vicariously liable, through the *respondeat superior* doctrine, for an employee's actions, the plaintiff must prove that the employee was acting within the course and scope of his employment when the injury occurred. *Hamrick v. Spring City Motor Co.*, 708 S.W.2d 383, 386 (Tenn. 1986); *Tennessee Farmers Mut. Ins. Co. v. American Mut. Liability Ins. Co.*, 840 S.W2d 933, 937 (Tenn. App. 1992).

Ordinarily the question of whether an employee is acting within the course and scope of his employment is one of fact for the jury; however, where the departure from the employer's business is of such a "marked and decided character" that reasonable minds could reach but one conclusion under the undisputed facts, summary judgment is proper. *Craig v. Gentry*, 792 S.W.2d 77, 80 (Tenn. App. 1990); *Home Stores, Inc. v. Parker*, 179 Tenn. 372, 166 S.W.2d 619, 622 (Tenn. 1942); *Tennessee Farmers*, 840 S.W.2d at 936-7.

*Davis v. Modine Mfg. Co.*, 979 S.W.2d 602, 607-08 (Tenn. Ct. App. 1998). This Court further discussed vicarious liability in *Tennessee Farmers Mut. Ins. Co. v. American Mut. Liability Ins. Co.* stating:

While the principles embodied in the respondeat superior doctrine are relatively easy to articulate, they are not always easy to apply. *Deihl & Lord v. Ottenville*, 82 Tenn. (14 Lea) 191, 194 (1884). The doctrine does not lend itself to bright line rules, *Hall Grocery Co. v. Wall*, 13 Tenn. App. 203, 208 (1930), but rather requires the weighing and balancing of the facts and circumstances of each case. *Leeper Hardware Co. v. Kirk*, 58 Tenn. App. 549, 556, 434 S.W.2d 620, 623–24 (1968); *Fitzgerald v. Wood*, 34 Tenn. App. 345, 349, 238 S.W.2d 103, 105 (1950).

The courts have frequently turned to the Restatement (Second) of Agency for the theoretical framework for deciding whether an employee's conduct is within the scope of his or her employment. Restatement (Second) of Agency § 228 (1957) provides:

(1) Conduct of a servant is within the scope of employment if, but only if:
(a) it is of the kind he is employed to perform;
(b) it occurs substantially within the authorized time and space limits;
(c) it is actuated, at least in part, by a purpose to serve the master; and
(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time and space limits, or too little actuated by a purpose to serve the master.

In addition, Restatement (Second) of Agency § 229 (1957) states:

(1) To be within the scope of employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.

(2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:

(a) whether or not the act is one commonly done by such servants;

(b) the time, place and purpose of the act;

(c) the previous relations between the master and the servant;

(d) the extent to which the business of the master is apportioned between different servants;

(e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;

(f) whether or not the master has reason to expect that such an act will be done;

(g) the similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

(i) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal.

*Tennessee Farmers Mut. Ins. Co. v. American Mut. Liability Ins. Co.*, 840 S.W.2d 933, 937-38 (Tenn. Ct. App. 1992).

In the case now before us with regard to this issue, the Trial Court specifically found and held:

Plaintiff has offered no evidence to suggest that Mr. Hale's actions were required by his position, job title, job description, or that Defendant has otherwise instructed him to intervene on behalf of his employer. Rather, the record states that the alleged assault occurred at Chimney Top Apartments, nearly one mile away from any property owned by CFRA, LLC. Given the location of the incident, the nature of Mr. Hale's job, and the fact that Mr. Hale had completed his shift before the alleged harm

17

occurred, it is impossible for a reasonable jury to conclude that Mr. Hale's actions could have been "reasonably foreseen" or otherwise prevented by the defendant.

The undisputed evidence in the record on appeal shows that Hale was hired as a dishwasher and that his job duties did not involve interacting with customers, particularly with regard to payment of a bill. The evidence further shows that after Hale took it upon himself to confront Plaintiff and Holland in the IHOP parking lot that the issue regarding the bill was resolved and that Plaintiff and Holland then left the IHOP. Plaintiff has shown no injury resulting from Hale's actions up until after Plaintiff and Holland left the IHOP.

The undisputed evidence shows that before the Assault occurred, Hale had finished working his shift, had clocked out, and had left the IHOP. Hale's conduct at Chimney Top was not within his IHOP job duties, was beyond the authorized time and space limits of Hale's employment, and was too little actuated by a purpose to serve IHOP. Once the bill had been paid and all parties had left the IHOP premises, it was not reasonably foreseeable that Hale and Plaintiff would go to another location where Hale then would assault Plaintiff. Hale's actions at Chimney Top were simply too attenuated from his employment at IHOP for a reasonable jury to conclude that Hale was acting within the course and scope of his employment when he assaulted Plaintiff. Hale was off-duty, off the IHOP premises, and not involved in any action at Chimney Top which reasonably could have been considered to be for the benefit of his employer. Furthermore, the force Hale used when he assaulted Plaintiff was not used for the benefit of IHOP as Hale did not use this force until after the bill had been paid. Hale exercised no force when he confronted Plaintiff and Holland in the IHOP parking lot about their bill. Hale's employer, CFRA, simply could not have expected Hale's use of force in this situation.

CFRA made a properly supported motion for summary judgment showing that Plaintiff would be unable to prove that Hale was acting within the course and scope of his employment at the time that he assaulted Plaintiff. While there may be a genuine issue as to some facts, there is no genuine issue as to any material fact. As such, CFRA was entitled to summary judgment on the claim for vicarious liability.

Next, we consider whether the Trial Court erred in granting summary judgment to CFRA on the claim for direct liability. Plaintiff alleged that CFRA was liable for negligent premises security and for negligently hiring and supervising Hale. With regard to negligent premises security, we note that this Court has held that a business owner has no duty to protect customers from an assault perpetrated by an off-duty employee outside of the business premises. *Finger v. James Gang Amusements*, No. E2004-00593-COA-

18

R3-CV, 2005 WL 756231, at *2 (Tenn. Ct. App. April 4, 2005), *no appl. perm. appeal filed*. CFRA has shown that the assault in the case now before us was perpetrated by an off-duty employee outside of the IHOP premises. As such, CFRA negated an essential element of Plaintiff's claim for negligent premises security, i.e., duty, and was entitled to summary judgment on this claim.

As for Plaintiff's claim for negligent hiring and supervision, we note that "[a] plaintiff in Tennessee may recover for negligent hiring, supervision or retention of an employee if he establishes, in addition to the elements of a negligence claim, that the employer had knowledge of the employee's unfitness of the job." *Bazemore v. Performance Food Group, Inc.*, 478 S.W.3d 628, 638-39 (Tenn. Ct. App. 2015) (quoting *Doe v. Catholic Bishop for Diocese of Memphis*, 306 S.W.3d 712, 717 (Tenn. Ct. App. 2008)). Plaintiff has produced no proof that Hale was unfit for the job of a dishwasher, which is the job for which CFRA hired Hale. We decline to hold that CFRA should be held liable for negligent hiring simply because it hired a convicted felon. Such a holding would effectively deter employers from hiring anyone with a felony record. The result would be that convicted felons would have a nearly impossible time finding gainful employment that would allow them to turn their lives around and become productive citizens. This would be contrary to public policy as evidenced by the Work Opportunity Tax Credit program that Gough testified about, a program which provides incentives for employers to hire certain targeted individuals such as ex-convicts in order to receive a tax credit.

We further decline to hold that CFRA should have provided a "capable guardian" to supervise Hale while he was at work. Plaintiff has produced no evidence showing that such a measure was necessary. Plaintiff has shown no injury that occurred during the time period when CFRA could have supervised Hale's actions. Nor has he shown that CFRA was on notice that such measures were necessary. As dicussed more fully above, CFRA could not have supervised Hale's actions after Hale had finished working his shift, clocked out, and left the IHOP premises. Hale was on his own time and acting in his own interest at the time of the Assault. CFRA made a properly supported motion for summary judgment showing that Plaintiff cannot establish that CFRA had knowledge of Hale's unfitness for his job as a dishwasher. As such, CFRA was entitled to summary judgment on this claim.

19

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Henry Fletcher, and his surety.

_____

D. MICHAEL SWINEY, CHIEF JUDGE